CITIZENS ACTION COALITION OF IN-
DIANA, INC.; City of Gary, Indiana;
Bailly Alliance, Appellants,

v.

NORTHERN INDIANA PUBLIC SER-
VICE COMPANY; United States Steel
Corporation; Bethlehem Steel Corpora-
tion; Inland Steel Company; National
Steel Corporation, Midwest Steel Divi-
sion; Union Carbide Incorporated,
Jones & Laughlin Steel Incorporated,
Jones & Laughlin Steel Corporation
Division, Office of Utility Consumer
Counsel, Appellees.

No. 1185S470.

Supreme Court of Indiana.

Nov. 19, 1985.

William Julian, II, Michael A. Mullet, In-
dianapolis, for Citizens Action Coalition of
Indiana, Inc.

Arthur A. Daronatsy, City of Gary Law Dept., Gary, for City of Gary, Ind.

William Drozda, Gary, for Bailly Alliance.

Frank E. Spencer, Indianapolis, for City of Gary, Ind. and Citizens Action Coalition of Ind., Inc.

Robert L. Thompson, Fort Wayne, for appellants.

Frederick F. Eichhorn, Jr., William H. Eichhorn, Charles W. Webster, Eichhorn, Eichhorn & Link, Hammond, for Northern Indiana Public Service Co.

Fred E. Schlegel, Michael J. Huston, Mary M. Stanley, Baker & Daniels, Indianapolis, for intervenors Inland Steel Co., Union Carbide Corp., and the Dalton Foundries, Ind. in Support of Northern Indiana Public Service Co.

Michael D. Alexander, U.S. Steel Corp., Pittsburgh, Pa., Robert L. Hartley, Martin & Hartley, Alki Scopelitis, Scopelitis & Garvin, Indianapolis, for appellees.

L. Parvin Price, John Q. Herrin, Office of Utility Consumer Counsel, Indianapolis.

Linley E. Pearson, Atty. Gen. of Ind., Robert K. Johnson, Deputy Atty. Gen., for Public Service Com'n of Ind.

Robert F. Hellmann, Max E. Goodwin, Mann, Chaney, Johnson, Goodwin & Williams, Terre Haute, for City of Terre Haute as amicus curiae.

Jerry P. Belknap, Richard E. Deer, James A. Strain, Barnes & Thornburg, Indianapolis, for American Fletcher Nat. Bank and Trust Co., Fort Wayne Nat. Bank, The Indiana Nat. Bank and Merchants Nat. Bank & Trust Co. of Indianapolis as amici curiae.

DeBRULER, Justice.

This case comes to this Court on petition to transfer from the Second District of the Court of Appeals. *Citizens Action Coalition of Indiana Inc., et al. v. Northern Indiana Public Service Company Inc., et al.* (1984), Ind.App., 472 N.E.2d 938. The Court of Appeals considered the issue of whether or not the Public Service Commis-

sion of Indiana (PSCI) acted contrary to law in permitting the Northern Indiana Public Service Company (NIPSCO) to amortize the sunk costs of the cancelled Bailly N–1 project through retail rates. The Court of Appeals reversed the cause and ordered the PSCI to vacate any rate increase occasioned by Bailly N–1. We grant transfer in order to resolve the question presented and other issues raised.

These are the facts pertinent to the issue. In 1970, NIPSCO embarked upon a project to construct a nuclear generating plant designated as Bailly N–1. Because of delays due to litigation, to opposition to licensing provisions involving safety, and to escalating costs, NIPSCO cancelled the project on August 21, 1981, after expending $205, 724, 170. NIPSCO never completed the Bailly N–1 project, nor did NIPSCO place it into service. The PSCI permitted NIPSCO to amortize $190, 746, 580.-00 through retail rates over a fifteen year period. The pertinent part of the PSCI's order is set forth here:

We resolve the issue as to whether amortization will be allowed affirmatively. *Indiana utilities are under statutory mandate to serve; "every public utility is required to provide reasonable, adequate service and facilities" (I.C. 8–1–2–4 and 8–1–2–69).* The record in this cause established that in order for a utility to meet its mandate to serve, it must begin construction of coal-fired generating facilities 8 to 10 years in advance of the need therefor with longer periods for nuclear powered facilities. If, in order to comply with the law, a utility must begin construction of generating projects many years in advance of the need for the power, it is the Commission's responsibility to assure that the risk in doing so is not so great as to discourage the endeavor. In 1971 when Petitioner began its effort to construct Bailly, N–1, nuclear power held great promise for efficient and economic power supply. Over the course of the years, the economic advantages of nuclear generation over other forms of generation

began to deteriorate and ultimately the delays resulting from regulatory indecision on the federal level and the changing economics forced the cancellation of Bailly, N–1 in August of 1981. This Commission has previously allowed amortization of costs incurred in abandoned and cancelled projects (Cause No. 32079 Dec. 12, 1979); Cause No. 36318 June 10, 1981). The amount of the amortization in prior proceedings was not as great as here, but the principle is the same. *We find that the Petitioner prudently began construction of Bailly, N–1 and that upon its cancellation, it became an extraordinary cost of service loss incurred in an effort to provide energy for the consumers of Petitioner's system. The loss occurred with the cancellation. The Bailly, N–1 project was a reasonable undertaking by Petitioner to meet its duty to serve.* The fact that the project was opposed by some for safety and environmental reasons cannot be given weight in this decision. The site locations, safety, environmental and many other issues were litigated in the Construction Permit proceedings, decided in Petitioner's favor by the agency with the jurisdiction to do so, the Nuclear Regulatory Commission (NRC), and reviewed and ultimately approved by the United States Court of Appeals for the Seventh Circuit and the United States Supreme Court.

The allowance of amortization of the Bailly, N–1 costs should not be confused with an allowance of a return on the value of a utility plant which is not used and useful in the utility's service. The Petitioner did not seek to earn a return on its investment in Bailly, N–1 during the period of amortization and no return on the investment will be provided in this order. *The authorized amortization is to permit the Petitioner to recover the sunk costs put forth in a reasonable effort to meet the mandate to serve, which unfortunately failed.*

## STANDARD OF REVIEW

The resolution of the issues in this case depends upon the definition of service in I.C. § 8–1–2–1 and the construction of the other statutes in Title 8 which confer upon the PSCI its rate making authority and power. The construction of Indiana law is particularly the province of this Court.

The Public Service commission derives its power and authority solely from the statute, and unless a grant of power and authority can be found in the statute it must be concluded that there is none. *Chicago & E.I.R. Co. v. Public Service Commission et al.* (1943), 221 Ind. 592, 49 N.E.2d. 341. An order is presumed valid unless the contrary is clearly apparent. Such presumption vanishes if the Commission fails to conform "to all relevant statutes, standards, and legal principles." *Illinois-Indiana Cable T.V. Inc. v. Public Service Commission* (1981), Ind.App., 427 N.E.2d 1100, 1105. The standard of review is governed by statute. I.C. § 8–1–3–1 states in pertinent portion.

"An assignment of errors that the decision, ruling or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered."

This statute provides a multiple-tier standard of review. At the first level, the statutory standard requires that the Commission's decision contain specific findings on all the factual determinations material to its ultimate conclusions. *L.S. Ayres & Co. v. Indianapolis Power & Light Co.* (1976), 169 Ind.App. 652, 351 N.E.2d 814, 822. At the second level, the statutory standard requires a reviewing court to inquire whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. *L.S. Ayres & Co. supra,* 351 N.E.2d at 822. In addition to determining whether or not the decision, ruling or order of the Commission is supported by specific findings of fact and by sufficient evidence, there is another matter in which this Court may always properly inquire, and that is the question of

whether or not the decision, ruling or order is contrary to law. See *Public Service Commission v. City of Indianapolis* (1956), 235 Ind. 70, 131 N.E.2d 308, 312. In other words, did the Commission stay within its jurisdiction and conform to the statutory standards and legal principles involved in producing its decision, ruling or order. See *Public Service Commission v. City of Indianapolis, supra,* 131 N.E.2d at 313.

I

NIPSCO contends that the amortization of sunk costs of the cancelled Bailly N–1 project is an allowable operating expense. NIPSCO relies on *City of Evansville v. Southern Indiana Gas and Electric Company* (1975), 167 Ind.App. 472, 339 N.E.2d 562 to support this proposition.

> The Commission's primary objective in every rate proceedings is to establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors.... I.C. 1971, 8–1–2–4 (Burns Code Ed.): *Federal Power Comm'n v. Hope Natural Gas Co.* (1944), 320 U.S. 591, 605, 64 S.Ct. 281 [289], 88 L.Ed. 333. The utility's revenues minus its expenses, exclusive of interest, constitute the earnings or the "return" that is available to be distributed to the utility's investors. Allowable operating costs include all types of operating expenses (e.g. wages, salaries, fuel, maintenance) plus annual charges for depreciation and operating taxes. While the utility may incur any amount of operating expenses it chooses, the Commission is invested with broad discretion to disallow for rate-making purposes any excessive or imprudent expenditures. I.C. 1971, 8–1–2–48 (Burns Code Ed.)

*City of Evansville supra,* 339 N.E.2d at 568, 569. Consequently, NIPSCO argues that there is not any type or category that is disallowable per se, unless prohibited by I.C. § 8–1–2–6(c) which states:

> In determining the amount of allowable operating expenses of a utility, the commission may not take into consideration or approve any expense for institutional or image building advertising, charitable contributions, or political contributions. [Acts 1913, ch. 76, § 9, p. 167; 1933, ch. 190, § 4, p. 928; 1947, ch. 307, § 1; 1979, P.L. 85, § 1.]

NIPSCO asserts that the determination of whether operating expenses are allowable or not is within the sound discretion of the PSCI and that the PSCI's determination cannot be overturned on appeal unless there is an abuse of that discretion. NIPSCO concludes that, since the PSCI's determination was supported by substantial evidence, the PSCI did not abuse its discretion, and thus, the PSCI must be affirmed on appeal.

This argument contains a fundamental flaw. To begin with, utility charges are based upon service. I.C. § 8–1–2–4 states that "The charge made by any public utility for any service rendered or to be rendered either directly or in connection therewith shall be reasonable and just." Service is defined in I.C. § 8–1–2–1:

> 8–1–2–1[54–105]. Definition—Short Title.
>
> The term "service" is used in this act in its broadest and most inclusive sense and includes not only the use or accommodation afforded consumers or patrons but also any product or commodity furnished by any public or other utility and the plant, equipment, apparatus, appliances, property and facility employed by any public or other utility in performing any service or in furnishing any product or commodity and devoted to the purposes in which such public or other utility is engaged and to the use and accommodation of the public.

Since this definition is no model of statutory draftsmanship, we find it helpful in our analysis to dissect the definition. Upon so doing, we discover three categories of "service" included therein:

> (1) The use or accommodation afforded consumers or patrons;
>
> (2) Any product or commodity furnished by the utility; or

(3) The plant, equipment, apparatus, appliances, property, and facility employed by the utility

(a) in performing any service, or

(b) in furnishing any product or commodity and devoted

(a) to the purposes in which such utility is engaged and

(b) to the use and accommodation of the public.

*Illinois-Indiana Cable T.V. v. Public Service Commission (1981),* Ind.App., 427 N.E.2d 1100, 1108–1109.

■ The ratemaking process has by statute and long-standing practice included the valuation of that property described in category (3) above which is "used and useful" in order to establish a rate base. The rate base consists of that utility property employed in providing the public with the service for which rates are charged and constitutes the investment upon which the return is to be earned. *City of Evansville supra,* 339 N.E.2d at 569. Any allowable operating expense must have a connection to the service rendered before it can be recovered through retail rates. See I.C. § 8–1–2–4. This connection is established when the operating expense is incurred as a result of the process whereby existing "used and useful" property, category (3) above, is employed to produce the product or commodity, category (2) above, or accommodation, category (1) above, rate payers receive. For example, wages, salaries, fuel, maintenance plus annual charges for depreciation and operating taxes. *L.S. Ayres & Co. v. Indianapolis Power & Light* (1976), 169 Ind.App. 652, 351 N.E.2d 814, 819. Here the cancelled Bailly N–1 project is not an operating expense because it was not a result of this process which establishes the requisite connection to service rendered. In fact, the Bailly N–1 project could never be an operating expense. At best, it could have become "used and useful" property which then could have incurred allowable operating expenses. However, such was not the case, as the PSCI specifically found that the Bailly N–1 project was never "used and useful" property. It also must

be recognized that the PSCI order did not characterize the cancelled Bailly N–1 project as an operating expense.

## II

NIPSCO argues that the PSCI's characterization of the Bailly N–1 project as an extraordinary cost of service loss is correct. The PSCI found that NIPSCO prudently began construction of Bailly, N–1 and that upon its cancellation, it became an extraordinary cost of service loss incurred in an effort to provide energy for its system. The PSCI characterized the Bailly N–1 project as a reasonable undertaking by NIPSCO to meet its duty to serve.

■ In essence, the PSCI order has unlawfully expanded the definition of service found in I.C. § 8–1–2–1 as construed by *Illinois-Indiana Cable T.V. v. P.S.C., supra.* The PSCI order places an additional charge on consumers other than that allowed in I.C. § 8–1–2–4. The additional charge is for reasonable and prudent attempts at service that fail and that provide no benefit to ratepayers.

Service commences with and includes "used and useful" property. Without "used and useful" property there cannot be any service. I.C. § 8–1–2–1, by defining service in such a manner as to render it dependent on "used and useful" property, is promoting a clear delineation and balance of investor and consumer responsibilities. In the competitive market, investors contribute capital which is employed to produce a product. Consumers purchase the product, and the purchase price includes a reimbursement for the capital contribution of the investors plus a profit to compensate the investors for the risk they assumed. In the market under consideration here, the utility is granted a monopoly. Utilities are regulated in order to protect the consumers from the abuses of monopoly i.e. artificially high prices. The statutes which govern the regulation of utilities and which grant the PSCI its authority and power provide a surrogate for competition. See *Public Service Commission v. Indiana Bell Tele-*

*phone Company* (1955), 235 Ind. 1, 130 N.E.2d 467. I.C. § 8–1–2–1 and I.C. § 8–1–2–4 insure that the responsibilities of utility investors and consumers are commensurate with the responsibilities of investors and consumers in a competitive market.

For example, if an automobile company embarked on a new capital project to build a factory that would produce a new sports car and then, before it ever produced a sportscar, cancelled it, the automobile company would ordinarily be unable to recover the cost from its consumers in a competitive market. This is the case we have here. NIPSCO embarked on a capital project to build a nuclear generating plant and, before it ever produced electricity, NIPSCO cancelled it. The definition of service in I.C. § 8–1–2–1 restricts the scope of includable property to that property which performs and furnishes, i.e. producing property or "used and useful" property. See also *Illinois-Indiana Cable T.V., supra* at 1108–1109. Consequently, I.C. § 8–1–2–1, in conjunction with I.C. § 8–1–2–4, protects consumers from having to pay for service not received, something which they would not be subjected to in a competitive industry. Since Bailly N–1 never became "used and useful" property as I.C. § 8–1–2–1 contemplates, the PSCI's characterization of the cancelled Bailly N–1 project as an extraordinary cost of service loss was incorrect and the order allowing amortization was contrary to law. In dealing with and resolving this claim, we have been unable to conceive of a situation of our own in which the consumers could be required to replenish lost capital which had never become "used and useful" property or, in other words, be required to act in aid and support of the utility as an insurer of the investor's risk, unless consumers received an interest in return which provided an opportunity to earn a return on the capital supplied.

### III

NIPSCO and amici curiae, the banks,[1] argue that the PSCI has allowed amortization of cancelled and abandoned plants numerous times over the past seventy-years and that the legislature has made no subsequent change in the utility statute in response. Consequently, they claim that this raises a strong presumption of legislative acquiescence and that this Court should defer to the administrative judgment of the PSCI. They further argue that it would be unfair if this Court were to disallow amortization when lenders were entitled to rely on this long standing practice of the PSCI.

> We have consistently recognized that a long adhered to administrative interpretation dating from the legislative enactment, with no subsequent change having been made in the statute involved, raises a presumption of legislative acquiescence which is strongly persuasive upon the courts. *State Board of Tax Commissioners of S. of Ind. v. Carrier Corp.,* (1977), 266 Ind. 615, 365 N.E.2d 1385; *Baker v. Compton* (1965), 247 Ind. 39, 211 N.E.2d 162; *Whirlpool Corp. v. State Board of Tax Commissioners* (1975), 167 Ind.App. 216, 338 N.E.2d 501.

*Indiana Department of Revenue, Indiana Gross Income Tax Division v. Glendale—Glenbrook Associates* (1981), Ind., 429 N.E.2d. 217, see also *Constanzo v. Tillinghast* (1932), 287 U.S. 341, 345, 53 S.Ct. 152, 154, 77 L.Ed. 350, 353.

> Although the interpretation placed upon the statute by an administrative agency of the State may not be binding upon this Court if the interpretation is incorrect, such interpretation as has been made and applied in a number of previous adoptions, is entitled to considerable weight, not only to insure the stability of adoption proceedings brought pursuant thereto for a number of years, but as evidence of the meaning of the statute to those charged by law and most concerned with its administration. See *State v. Griffin*

---

1. Merchants National Bank, American Fletcher National Bank, Fort Wayne National Bank, Indiana National Bank.

(1948), 226 Ind. 279, 284, 79 N.E.2d. 537, 540.

*Baker v. Compton* (1965), 247 Ind. 39, 211 N.E.2d 162, 164.

■ NIPSCO and Amici cite these cases to establish that the PSCI has adhered to its interpretation of allowing amortization of cancelled and abandoned plants since the enactment of the Spencer-Shively Act in 1913. *Commercial Club v. Terre Haute, I & E Traction Co.*, (Ind.Pub.Serv.Comm'n April 27, 1917), Cause No. 317, P.U.R. 1917 D., 743, 747–748; *Owensville Light Co.*, (Ind.Pub.Serv.Commin, Sept. 29, 1920), Cause No. 5556; *Toner v. Martinsville Gas & Elec. Co.*, (Ind.Pub.Serv.Comm'n, April 27, 1923), Cause No. 6959, P.U.R. 1923 E., 69, 71–73; *Indianapolis Railways*, Inc., Pub.Serv.Comm'n, May 7, 1953), Cause No. 23408, 382–A, 100 P.U.R. (N.S.) 207, 217; (*Indiana & Michigan Elec. Co.*, (Ind.Pub.Serv.Comm'n September 21, 1978), Cause No. 35251.) With the exception of the last case, these cases establish a long—adhered to administrative interpretation of allowing amortization of abandoned plants. i.e. plants that were "used and useful" property and then retired from service.[2] This is clearly distinguishable from allowing amortization of cancelled plants that never became "used and useful". Allowance of amortization of cancelled plants would encourage uneconomical or unproductive ventures; whereas, allowance for amortization of abandoned or retired plants encourages utilities to remove obsolete plants and property from the ratebase. This treatment also benefits consumers because obsolete and inefficient property is removed from the ratebase.

Nevertheless, the doctrine of legislative acquiescence is an estoppel doctrine designed to protect those who rely on a long standing administrative interpretation. Here, the cases appellant and amici cite do not support a principled basis for reliance in light of the unique circumstances that the Bailly N–1 cancellation presents.

## IV

We also address the issue that forms the basis of the dissent in the opinion of the Court of Appeals. Whether or not the Bailly N–1 project qualifies as an accommodation aspect of service as contemplated by I.C. § 8–1–2–1.

The dissent claims that "accommodation" in I.C. § 8–1–2–1 should be defined as it is in *Webster's Third New International Dictionary* 12 (1976) because the specialized legal meaning derived from commercial paper practices is inapposite to construction of the statute. The dissent asserts that the applicable definition is "something that is supplied for convenience or to satisfy a need." As a result, the dissent found that if this definition of accommodation is construed in its "broadest and most inclusive sense" (language taken from I.C. § 8–1–2–1) most of the Bailly N–1 costs are recoverable through amortization from the consumers.

This analysis is flawed in several respects. First, it is the term "service", not the term "accommodation" which is to be interpreted in its "broadest and most inclusive sense" in I.C. § 8–1–2–1. Second, the term accommodation has a specific legal meaning in the context of public utility regulation.

The Railroad Commission law, Ind. Acts 1905, Chapter 53 and Ind.Acts 1907, use the term accommodation in the following manner.

> The power and authority is hereby vested in the railroad commission [public service commission] of Indiana, and, and it is hereby made its duty, as hereinafter provided, to supervise all railroad freight and passenger tariffs, and to adopt all necessary rules and regulations to govern car distribution and delivery, *train service and accommodations* ... [etc.]

IND.STATS.ANNO. 55–101 (Burns Ed. 1949, pages 801, 8110); Acts 1905, Chapter

---

**2.** We do not believe that the I & M case is sufficient by itself to establish a long-adhered to administrative interpretation. Also, the magnitude of the amortization in the I & M case is not comparable with the Bailly N–1.

53, § 3, as amended by Acts 1907, Chapter 241, § 21. Emphasis added.

55–904. Passenger violation rules. —In case any passenger on any railroad shall be injured on the platform of a car, ... in violation of the printed regulations of the company, posted up at the time ... such company shall not be liable for the injury: Provided, Said company, at the time, furnished room inside its passenger cars *sufficient for the proper accommodation of its passengers.*

IND.STATS.ANNO. 55–904; 1 R.S. 1852, Chapter 83, § 32; emphasis added.

55–701. Duty as to running trains.—Every such corporation shall start and run its cars for the transportation of persons and property at regular times, to be fixed by public notice, and *shall furnish sufficient accommodation for the transportation of all such passengers and property* as shall, ..., offer or be offered for transportation at the place of starting, ....

IND.STATS.ANNO. 55–701 (Burns Ed. 1949, p. 919); 1 R.S. 1852, Chapter 83, § 29; emphasis added.

Statutes which relate to the same thing or general subject matter are *in pari materia* and should be construed together. 26 I.L.E. Statutes § 130; *State v. Gerhardt* (1896), 145 Ind. 439, 44 N.E. 469; *Starr v. City of Gary* (1934), 206 Ind. 196, 188 N.E. 775. The term "accommodation" in the definitional section of the Public Service Commission Act must be read *in pari materia* with the same term in the Railroad Commission law.

A word or phrase which appears in different parts of the statute will be given the same meaning, unless an intention to the contrary clearly appears. 26 I.L.E. Statutes § 117; *City of East Chicago v. State ex. rel. Pitzer* (1949), 227 Ind. 241, 84 N.E.2d 588.

Contemporary case-law also uses the term "accommodation" in this precise

sense. C.F., *American Express Company v. Southern Indiana Express Co.* (1906), 167 Ind. 292, 78 N.E. 1021, 1026; *State v. Pittsburg, C.C. & St. L. Railway Company* (1893), 135 Ind. 578, 35 N.E. 700, 701.

This legislative history negatives the artificial construct that attempts to equate statutory "service" provided in the course of normal operations with unsuccessful efforts to provide service in the distant future.[3]

■■■■ Accommodation, in the sense used in I.C. § 8–1–2–1, is a benefit the consumer receives that is closely related to the product or commodity the consumer purchases. The Bailly N–1 project could not be an accommodation because it did not confer any benefit on the consumer.

It is clearly apparent upon examination of the governing statutory provisions, their purposes, and the standards and legal principles which must guide their application, that the subject order of the PSCI authorizing amortization of the sunk costs of the Bailly N–1 project has been made without statutory authorization. The Public Service Commission of Indiana is therefore ordered to vacate such order.

PIVARNIK, J., concurs.

SHEPARD, J., concurs in majority opinion and also files concurring opinion.

GIVAN, C.J., dissents with opinion in which PRENTICE, J., concurs.

PRENTICE, J., dissents, with opinion in which GIVAN, C.J., concurs.

SHEPARD, Justice, concurring.

While I have joined today in the majority opinion, I find it necessary to add that I believe at least some of the expenses allowed by the Public Service Commission can be affirmed on the basis of legislative acquiescence.

---

**3.** The dissent's analogy to research and development expenditures as an example of expenditures "not actively utilized in operations" is inapt. The cases he relies on involving South

California Edison are based on a specific legislative authorization. Cal.Public Utilities Code § 740.

As appellee Northern Indiana Public Service Company (NIPSCO) correctly points out, this Court has recognized that where an administrative interpretation has existed over a long period of time without being reversed through amendment of the statute, the courts should presume that the legislature has acquiesced in the manner in which the agency has interpreted the law. This presumption is said to aid the courts in understanding legislative intent. Although the interpretation placed upon the statute by an administrative agency is not binding upon the courts, it is entitled to considerable weight "as evidence of the meaning of the statute to those charged by law and most concerned with its administration." *Baker v. Compton* (1965), 247 Ind. 39, 42, 211 N.E.2d 162.

With respect to the case at bar, NIPSCO has cited a number of ratemaking cases under the Public Service Commission Act in which:

> the Commission has consistently interpreted it to permit the inclusion in rates, as an operating expense, of the cost of [a] prudently cancelled plant and the Legislature by not changing the statute has acquiesced in this interpretation.

Appellee's Brief in Support of Petition to Transfer, pp. 54–55. However, as Justice DeBruler has pointed out in writing for the majority, most of the cases cited by NIPSCO involved plants which were "used and useful" property and then retired from service. To use the cases of "property abandoned or otherwise retired from service" as support for the amortization of nuclear steam supply equipment or turbines is simply putting too much weight on too slender a thread. Since the legislature has repeatedly declined to authorize including in rates those expenses associated with construction work still in progress, it is hard to accept the argument that the legislature has acquiesced in the inclusion of construction expenses for work no longer in progress.

There are some rate cases, though, from which the argument for legislative acquiescence seems to support a part of the expenses approved by the Commission. The most germane of these is *Public Service Company of Indiana* (Ind.Public Service Commission, June 10, 1981, Cause No. 36318). In that case the Commission allowed amortization of $3,595,000 for outside services related to studies of the feasibility of constructing two additional nuclear generating units at its Marble Hill site. The utility decided not to construct the units. The Commission explained its approval as follows:

> The prudence of Petitioner's decision to perform such studies was not challenged, nor was the prudence of its decision not to construct the units, and we find such decisions to have been prudently made. Both the Public and Staff, however, recommend that Petitioner's shareholders be required to pay such costs. The evidence indicated that Petitioner is not seeking any return on its unamortized balance, in effect requiring its shareholders to share in such costs. We note that many state commissions when faced with similar abandoned nuclear projects, including the FERC, have allowed amortization of such costs similar to that proposed by Petitioner. We feel that in light of the prudence of Petitioner's actions incurring such costs for the benefit of its ratepayers, such costs should be amortized in the manner recommended by Petitioner.

*Supra,* at 11.

The Commission has also authorized amortization of management studies aimed at making a utility operate more efficiently. *Indiana & Michigan Electric Company* (Ind.Public Service Commission, January 31, 1977, Cause No. 34588). Somewhat farther afield, it has charged ratepayers for the expenses associated with studying a utility's construction program as a part of a rate case. *Public Service Company of Indiana* (Ind.Public Service Commission, January 20, 1983, Cause No. 36818).

These cases seem to approve expenses for studies which are intended to improve the efficiency of the utility on the assumption that there will be gain for the ratepay-

ers as well as for the stockholders. In this respect, they are founded on the same premise as the cases permitting amortization of the remaining basis of plants retired from service. The Commission has concluded that the ratepayers are better off if utilities can retire an inefficient plant early and still recapture their whole investment than if a company could only recapture it investment by continuing to operate an inefficient plant.

Even these cases make only a modest argument for legislative acquiescence, since the General Assembly can only be said to acquiesce if it chooses not to act *after* the Commission issues a decision. The earliest of these cases is dated 1977 and NIPSCO has been spending money on Bailly N-1 since the late 1960s. Nevertheless, there is a presumption of validity which this Court gives to decisions rendered by the Commission. *Public Service Commission v. City of Indianapolis* (1956), 235 Ind. 70, 131 N.E.2d 308. I conclude that expenses in the nature of planning, analysis, and investigation of the Bailly project, associated with both the decision to build and the decision to cancel, should be declared to be within the Commission's sphere of authority to approve. While this is presumably only a small portion of the $190 million allowed by the Commission, it is still a multi-million dollar proposition, and I would remand to the Commission for a determination of the actual extent of these expenditures.

Unfortunately, this view has not attracted sufficient concurrence to make it an order of the Court, and I have joined the majority in its conclusions on the construction of the Public Service Commission Act.

Finally, I think it is important to re-emphasize that there is nothing in today's action which should be read as meaning that the Court regards the Commission's practice of permitting amortization of the unrecovered basis of plants retired from service as being outside its authority.

GIVAN, Chief Justice, dissenting.

I respectfully dissent from the majority opinion in this case. Although I concur with Justice Prentice in his dissenting opinion, I feel the necessity of writing a separate dissenting opinion due to the importance of this case. On page 611 of the majority opinion, they quote the pertinent part of the PSCI's order in this case. For the sake of brevity it will not be repeated here.

The majority opinion claims the order of the PSCI contains a fundamental flaw, in that "to begin with, utility charges are based upon services." The majority then quotes from Ind.Code § 8-1-2-4 which states "[t]he charge made by any public utility for any service rendered or to be rendered either directly or in connection therewith shall be reasonable and just."

At page 614 of the majority opinion, they quote the statutory definition of service found in Ind. Code § 8-1-2-1. The beginning sentence of which is:

"The term 'service' is used in this act in its broadest and most inclusive sense and includes not only the use or accommodation afforded consumers or patrons but also any product or commodity furnished by any public or other utility and the plant, equipment, apparatus, appliances, property and facility employed by any public or other utility in performing any service or in furnishing any product or commodity and devoted to the purposes in which such public or other utility is engaged and to the use and accommodation of the public."

As was stated in *City of Evansville v. Southern Indiana Gas and Electric Company* (1975), 167 Ind.App. 472, 339 N.E.2d 562, the Public Service Commission must establish a rate level sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors.

There is no question but what the Public Service Commission also has the duty to see that the consuming public is charged a fair rate and that those rates are not fraudulently or carelessly inflated by the utility. However, in order to "render service" any

utility must be operated on a sound business basis, otherwise there would be no "service." Any business, whether it be a public utility or a privately operated business for profit, must be entirely paid for by its customers. This is true as to absolutely every capital expense and operating expense, whether it be necessary in the rendering of the service directly or whether it be generated by mistakes made in the operation of the business; such as, automobile accidents, faulty construction of buildings and so forth. If the company is to succeed and to continue to operate, absolutely all of these expenses must be paid by the customer. There is no other source of revenue.

It is extremely naive to say that we will not allow the rate to be increased to cover the expense but will require the shareholders to pay that expense. In making such a decision, the Public Service Commission would raise absolutely no income to be used by the utility. Depriving stockholders of return is not a fund raising operation. If the debts of a corporation are to be paid, they must of necessity be paid by the customers. In the instant case, if the corporation is to continue to operate, it must of course pay its debts. Those debts must be paid from the income generated by rates.

The Public Service Commission has the authority to reduce the rates to the extent that little or no return could be paid to the investors by way of dividends. Nevertheless, this lack of dividend would produce no revenue to pay the debts of the corporation. Absolutely every cent of debts paid must be paid out of revenue generated by rates. If the Public Service Commission would reduce the rates to the point where no dividends could be paid, then the health of the utility would be gravely impaired. One of the primary duties of the Commission would be neglected, that being the maintenance of a healthy utility company.

The majority opinion uses an example of an automobile company embarking on a new capital project as though in some manner that differed from the nature of the business of a utility. The only difference of a business in the private sector, operating in the open market, and a business such as a utility in the public sector, operating as a monopoly, is the public control over the company. Whether the control of the company be private or public, sound business practices and reality must be observed.

In the example of the automobile company used by the majority, if the company is to survive and continue in business, any of their losses, including a false start on a new capital project, will eventually be paid for by the customer. If that does not occur, then the company will be an unsuccessful operation. If it continues for any prolonged period, the company will be bankrupt. If those persons investing their capital in a business enterprise, whether public or private, cannot recoup all of their original capital investment and cannot make a reasonable return on their investment, their company will cease to exist.

It does a disservice to the parties to this litigation and to the public generally to engage in semantics which tend to build a false picture that in some manner some of the debts of the corporation will be paid in a manner other than the collection of rates. If the Public Service Commission would reduce the rate to such a low figure that not only stockholders could not get a return on their investment but that not all the debts could be paid, then bankruptcy would result. The creditors of the corporation would become victims of the bankruptcy. The stockholders of course would lose the value of their stock. For the PSCI to so act would be a gross neglect of their duty under the law.

Referring again to the order of the Public Service Commission, as set forth on page 611 of the majority opinion, I find it to be entirely within the law, entirely lucid and sound in business practice and in fact the only realistic approach to the problem with which they were presented. I go back to the statement made in *State ex rel. Water Company v. Boone Circuit Court* (1974), 261 Ind. 583, 586–87, 307 N.E.2d 870, 872 where it was stated "[t]his Court has stated many times that rate making is

a legislative and not a judicial function. The legislature has seen fit to establish this Public Service Commission for the express purpose of hearing evidence and balancing and weighing the many complicated factors which must be taken into consideration in settling utility rates." I feel that to deviate from this language is to impinge the Public Service Commission with judicial fiat that is wholly unrealistic and makes their job virtually impossible.

I would set aside the opinion of the Court of Appeals and would affirm the decision of the Public Service Commission in its entirety.

PRENTICE, J., concurs.

PRENTICE, Justice, dissenting.

I dissent. That hard cases make for bad law has, to me, never been better demonstrated than by the majority decision.

I am unable to distinguish this case from others where utility companies have been permitted to recover their cost of fulfilling their statutory obligations, except upon the basis of the magnitude of the cost in this particular case and the resultant outcry of an uninformed and misinformed, but unfortunately large and vociferous, segment of consumers.

The issue is one of first instance in this State, i.e., who shall bear the cost of a gargantuan misadventure of a utility company occasioned by a good faith and prudent but, nevertheless aborted, endeavor to comply with its statutory mandate to provide "reasonably adequate service and facilities." The majority has chosen to rationalize that, as a matter of law, inasmuch as the expenditures of the company did not produce a physical facility that was productive of electricity (used and useful), they may not be recovered from the rate payers. I see no such constriction in the law.

I do agree with the majority that the Public Service Commission derives its power and authority solely from the statute; but I do not agree, as its opinion seems to imply, that such grant need be so detailed as to leave nothing to the judgment and discretion of the commission. In fact, the generality of the grant of rate making authority is, in and of itself, a grant of broad discretion, without which the commission could not carry out its mission. It is not a mere ministerial or fact finding body.

I see five sections of the statute bearing upon the authority of the commission in fixing electric rates. Ind.Code 8–1–2–4 is the broad general mandate that the rates be "reasonable and just." Ind.Code 8–1–2–6, Ind.Code 8–1–2–19, Ind.Code 8–1–2–23 and Ind.Code 8–1–2–24 are very specific with regard to certain considerations that are either required or precluded from inclusion in rate determinations, without regard to the reasonableness or equity of the matter.

Although administrative boards do not have inherent powers in the sense that courts do, it is implied in all statutes that that which is incidentally necessary to a full exposition of the legislative intent should be upheld as being germane to the law. *Coplay Cement Mfg. Co. v. Public Service Commission* (1921), 271 Pa. 58, 114 A. 649, 16 A.L.R. 1214. In the construction of a grant of powers, it is a general principle of law that where the end is required, the appropriate means are given, and that every grant of power carries with it the use of necessary and lawful means for its effective execution. The broad general grant is that the Public Service Commission shall have the power to fix electric rates that are "reasonable and just," and the necessary and inescapable conclusion is that, except as otherwise expressly provided, the commission is vested with the discretion to determine the reasonableness of such rates. True, there is no express grant of authority to permit an electric company to recover the cost of the misadventure, but neither is there an explicit grant of authority to allow such companies to recover their costs of operation such as labor costs, fuel costs, taxes, losses on uncollectable accounts, management salaries and professional fees. Yet we know that such costs are allowed, because to allow them is reasonable and just, and to disallow them

would be confiscatory and not in furtherance of the public policy authorizing regulated monopolistic public utilities.

Administrative agencies have and should be accorded every power which is indispensable to the powers expressly granted, that is those powers which are necessarily or fairly and reasonably implied as an incident to the powers expressly granted. 1 Am.Jur.2d *Administrative Law*, § 44. Typical is the holding in *Pan American World Airways, Inc. v. United States* (1963), 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325, to the effect that the absence of an explicitly included grant in the statutorily authorized power of the administrative agency was no bar to its order of divestiture.

I am also of the opinion that the doctrine of legislative acquiescence is clearly applicable from the allowance by the commission for a period of seventy (70) years, without generating legislative change, of the recovery of costs of the nature allowed in this case.

The majority opinion summarily dismisses the contention that amortization of the loss is allowable under that doctrine by responding that the circumstances presented by the Bailly N–1 cancellation are "unique." There is nothing whatever unique about the Bailly N–1 circumstances that bears upon the issue. Of course the details vary, but the substance is the same. Except in a consideration of what is includable in the rate base, no distinction can be made between costs occasioned by the abandonment of completed facilities that have become valueless because of changed circumstances and the abandonment of partially completed or merely planned facilities that have become valueless because of changed circumstances. In either event, a loss is sustained as a result of a prudent attempt to serve the best interests of the rate payer.

Under the viewpoint of the majority, a utility that had prudently spent ten-x dollars towards bringing a new facility onto line could complete it and put it into service for one day, notwithstanding that changed circumstances rendered doing so a useless and wasteful act; and, although it could not recover its costs expended subsequent to the time completion became imprudent, it could recover its cost expended to that point. Thus, if the halfway point has been passed, a facility should be completed, regardless of its folly.

The majority has written "Allowance of amortization of cancelled plants would encourage uneconomical or unproductive ventures; whereas, allowance for amortization of abandoned or retired plants encourages utilities to remove obsolete plants and property from the ratebase." The logic of this analysis escapes me. Regardless of when a project is written off as unproductive, the best the company can hope for is to recover the unamortized cost; and this, in many respects, hinges upon the judgment of the commission. It can never make a profit from abandonment; and if the abandonment occurs prior to the time the project costs are placed in the ratebase, as representative of used and useful assets, the extent of the recovery of the loss depends upon the discretion of the commission in determining whether or not the venture was prudently entered upon, prudently continued to the point of cancellation and prudently cancelled.

To allow expenses and extraordinary losses of the nature of those under consideration to be placed in the ratebase would place a premium upon waste and imprudence, because a profit would be thereby realized upon the funds wasted or lost in the mismanagement. There can be no such inducement, however, in permitting a utility to pass along the base costs incurred in a prudent attempt to improve or preserve the service that the law requires it to render.

The majority holds that operating expenses, to be recoverable through retail rates, must have been incurred through the employment of existing used and useful property. I cannot find this in the statute, but it is of no moment in my analysis. Some confusion has, perhaps, been added by NIPSCO's references to the losses in

issue as "expenses." This characterization is, no doubt, logical inasmuch as it seeks to obtain, for the loss, the same treatment accorded to expenses, thus it does fit the die that has been developed by commission usage and custom. I prefer the characterization of the commission: "extraordinary cost."

At this juncture, it need be noted that invested capital and expenses of operating are treated differently in the ratemaking process. It occurs to me that extraordinary losses should be treated as expenses are treated rather than in the manner that capital is treated; and this accords with the position of both NIPSCO and the commission.

Returning to the essence of the statutes and elementary precepts of utility law, we know that the public policy to be served is to permit monopolistic ownership and operation of public utilities because, if properly regulated and supervised, the public will be served better than it would be by our generally preferred free enterprise system. The extent, quality and cost of the service to be rendered depends upon a balancing of investor interests and consumer interests. The balancing is affected by the State, through its statute requiring the company to furnish "reasonably adequate service and facilities" and its rates to be "reasonable and just" and establishing the commission to regulate and supervise the system. The objective of the system is to obtain, for the public good, the maximum service at the lowest cost.

A substantial factor in any business enterprise is the risk involved. Electric utilities are capital intensive ventures, that is to say that extraordinarily large sums of money are required to be invested for long periods of time, hence the cost of that capital is a far greater factor in the cost of production than in other industries. The cost of capital, whether debt or equity, varies in direct proportion to the risk perceived by the investors. Traditionally, capital in the free market is available to electric utility companies at costs far less than such cost to any other industry, simply because the risk encountered is less. The market for the product is assured, and competition has been eliminated, hence the risks are only those attendant to production efficiency and the determination of what is reasonable and just in the fixing of rates. So long as investor confidence in the integrity of the system is high, capital will be available at the lowest rates possible. If that confidence is diminished, however, utilities will become high risk, rather than low risk, investments, and the return required to induce investment will rise; and if that confidence is lost, such capital will simply not be available.

The majority has displayed an alarming lack of comprehension in its comparison of the losses occasioned by an automobile manufacturer attempting to bring a new product to market and those sustained by NIPSCO in endeavoring to develop a nuclear powered generating plant. Two very pertinent differences relevant to the reasonable relegation of the losses will be given.

(1) The manufacturer was under no command to furnish a new product, or anything else, for that matter. NIPSCO was.

(2) If successful, the manufacturer would be at liberty to charge the consumer whatever the market would bear, even if profits so excessive as to be obscene could be thereby derived. NIPSCO, if successful would, nevertheless, be constrained to "reasonable and just charges," as determined by the commission.

So the primary beneficiary of a successful venture by the manufacturer is the investor. Whereas, the primary beneficiary of a successful venture by the regulated utility company is the consumer. The utility investor continues to receive what he did before: a reasonable and just return—presumably the same rate of return on invested capital that he was receiving before, with only the amount of the investment being altered. The utility consumer, on the other hand, would receive the benefits of improved service, cheaper service, or both. To expect the investor, with nothing or little to gain, to assume all of the risk

and the consumer, with much to gain, to assume none is neither reasonable nor just and is inherently unrealistic.

Under the majority opinion, all risk of new construction falls upon the investor, and it has but little to gain, yet it is literally impossible for an electric company to fulfill its obligations without expending vast sums for plans and construction necessary for the rendition of services in the future.

The majority opinion barely mentions the statutory duty of utility companies to provide "reasonably adequate services and facilities" and cavalierly proceeds with the observation that utilities are monopolies and subject to regulation. It does not recognize that the duty to serve goes hand in hand with the limitations upon and entitlement to rates that are reasonable and just. Rates that do not permit a profit may, nevertheless, be reasonable under the circumstances. However, rates that do not permit the recovery of costs for service and facilities that are mandated are confiscatory and unlawful.

If electric companies do not plan and build in advance of demand, it is inescapable that eventually the production facilities once "used and useful" will become "used and useless," and service will be inadequate or non-existent. A company that does not plan and build ahead against such eventuality may not be said to be providing service and facilities that are "reasonably adequate."

On writing this dissent, I assume that every dime spent by NIPSCO was spent in a prudent endeavor to comply with the requirement of the law to provide electrical energy that would be required in the foreseeable future to serve its franchised area. I realize that this may not be entirely correct. There may have been some avoidable waste. There may have been some degree of imprudence at some junctures. The commission, however, has found to the contrary, and we are bound by its findings, if they are supported by the evidence heard by the commission. The majority has said that it does not matter whether the venture

was or was not necessary, that it does not matter if the facilities were probably inadequate to fulfill future demands, that it does not matter that NIPSCO was required by law to enter upon and pursue the venture, that it does not matter that everything it did was correct and prudent, and that it does not matter that the rates to be received in the future will not be reasonable and just. All that matters is that the statute contains no explicit provision authorizing the commission to allow recovery of such loss.

Had the commission determined that all or any portion of the loss was the result of imprudence or speculation to capitalize from a potential wholesale market and had disallowed amortization of some portion, or all of the loss, I would vote to affirm its decision, unless it were shown that such determination was not sustained by the facts. That is the law, and in my judgment, under the facts of this case we are limited to a review of the facts to determine if the commission's determination is thereby sustained.

Prudent management is the responsibility of the investor. Infallible management and the production of utopian services at rates that will please the consumers are not.

Not only do I regard the decision of the majority to be in gross error, as a matter of law, I believe the result to be a societal disaster. Capital for utility companies subject to the law of this case will, in my judgment, be available only at extremely high rates—if at all. What have historically been regarded as conservative, low risk securities will become highly speculative. Capital that is already committed will of course remain invested, because it cannot escape, thus the consumers in the NIPSCO franchise area may, for the present, be benefitted. Nevertheless utility companies cannot continue to provide "reasonably adequate" services without constant infusions of newly committed capital. At risk is the survival of investor-owned public utilities. In my judgment, the prospects for socialization of the industry are good; but the

prospects for adequate services at reasonable rates under that system are dim.

I would affirm the Public Service Commission's decision.

GIVAN, C.J., concurs.