**NORTHERN INDIANA PUBLIC SERVICE COMPANY,**
Appellant,

v.

**UNITED STATES STEEL CORPORATION,**
Appellee.

No. 93A02–0706–EX–467.

Court of Appeals of Indiana.

March 7, 2008.

Rehearing Denied May 7, 2008.

Peter L. Hatton, Jon B. Laramore, Elizabeth A. Herriman, Baker & Daniels LLP, Indianapolis, Gregory S. Colton, Nisource Corporate Services Co., Merrillville, IN, Attorneys for Appellant.

John F. Wickes, Jr., Todd A. Richardson, Bette J. Dodd, Steven W. Griesemer, Lewis & Kappes, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Northern Indiana Public Service Company ("NIPSCO") appeals the Indiana Utility Regulatory Commission's ("IURC" or "Commission") grant of United States Steel Corporation's ("U.S.Steel") Motion for Summary Judgment.[1] We reverse and remand.

### Issues

The parties each raise two issues on appeal, which we consolidate and re-state as:

I.    Whether this Court should review de novo an agency's grant of summary judgment based entirely upon principles of contract interpretation; and

II.    Whether the IURC erred in interpreting the documents executed by the parties.

### Facts and Procedural History

This appeal concerns a contract for NIPSCO's sale of electricity to U.S. Steel, relating in particular to U.S. Steel's facilities in Gary ("Gary Works"), its electric generating facilities in Chicago ("South Works"),

---

1. We heard oral argument in this case on January 29, 2008 in Indianapolis.

and a transmission line connecting them. The facts are not disputed.

In 1998, U.S. Steel filed a complaint with the IURC regarding a dispute with NIP-SCO.[2] In May and June of 1999, the parties executed seven documents to resolve the litigation and continue their relationship. On May 12, the parties executed a Term Sheet which specified the duration of the agreement, the "price for power to Gary Works on an annual average per kwh basis," and a series of other provisions. Appendix at 121. The Term Sheet established five different time periods and the price in mills-per-kilowatt-hour for each time period.[3] The price for the last of those time periods, October 1, 2005 through the end of the contract, was subject to a market based price adjustment factor. Under the heading "Contract Determinants," the parties noted that "[t]he prices ... are based upon [Q] KW of demand and energy usage of [P] Kwh."[4] *Id.* at 121. Finally, in the Term Sheet, the parties agreed to "use their best efforts to develop mutually satisfactory contractual documents to implement the provisions of this term sheet and to obtain necessary corporate and IURC approvals thereof." *Id.* at 123.

Over the course of June 16 and 17, the parties executed six other documents: the Contract for Electric Industrial Power Service ("Contract for Power"), the Settlement Agreement, the Letter Agreement, the Operation and Control Agreement ("Operation Agreement"), the Facility/Property Lease ("Lease"), and the Ac-cess/Use License Agreement ("License"). The latter two were, in fact, agreements between U.S. Steel and South Works Power Company ("SWPC"), whereby SWPC would operate South Works and the transmission line. The Letter Agreement incorporated by reference the Term Sheet executed a month earlier.

Article 5.2 of the Contract for Power established a Demand Charge and an Energy Charge. The Demand Charge provision contained precisely the same five time periods as those designated in the Term Sheet. As in the Term Sheet, the Demand Charge was reduced marginally for each successive time period. Unlike the Term Sheet, with prices measured in mills-per-*kilowatt-hour*, the Demand Charge was measured in dollars-per-*kilowatt*. Though identified in different measures, the prices in the Term Sheet and those in the Contract for Power's Demand Charge were identical for each of the five time periods, as described *infra*.

The Energy Charge applied to energy used in excess of a particular amount per month. For the entire contract term, the Energy Charge was U mills-per-*kilowatt-hour*. The Term Sheet had not contained a similar provision.

Article 5.1 of the Contract for Power addressed the market based price adjustment factor.

> [NIPSCO] will bear the fuel price risk during the term of this contract; however, effective October 1, 2005 through the end of the Contract term; a market

---

**2.** The Commission's Order on Summary Judgment indicated that "[t]he dispute ... was part of a long running dispute between U.S. Steel and NIPSCO regarding electric generation and transmission facilities at U.S. Steel's South Works facility." Appendix at 11. *See U.S. Steel Corp. v. N. Ind. Pub. Serv. Co.,* 482 N.E.2d 501 (Ind.Ct.App.1985), *reh'g denied, trans. denied.*

**3.** A mill is one tenth of a cent. http://www.eia. doe.gov/glossary/glossary—m.htm (last viewed Feb. 7, 2008).

**4.** We use P, Q, R, S, T, and U where the documents contained numbers.

based price adjustment factor will be used to adjust the *kilowatt-hour* prices set forth in Article 5.2.

Appendix at 32 (emphasis added).

The parties submitted for the IURC's approval the Contract for Power and the Settlement Agreement, but none of the other five documents. The IURC conducted an evidentiary hearing during which the parties presented testimony. In addition, the Office of Utility Consumer Counselor ("OUCC") participated and cross-examined one of the witnesses. The IURC found as follows:

> [T]he Settlement [Agreement] and accompanying [Contract for Power] resolve all of the outstanding issues ... in a manner that is reasonable, in the public interest, and adequately supported by substantial evidence of record, practicable and advantageous to the parties, not inconsistent with the Act, and in compliance with the provisions of [I.C. §§ 8–1–2–24 and –25].
>
> The Settlement [Agreement] and [Contract for Power] should promote stabilization and expansion of industrial growth in [NIPSCO's] territory and contribute to U.S. Steel's Gary Works' competitiveness. U.S. Steel should receive an immediate and significant reduction in its electricity costs for its Gary Works facility. [NIPSCO] receives assurance that it will retain the business of U.S. Steel, one of its largest customers, on a long-term basis. [NIPSCO's] other customers should benefit from U.S. Steel's continued contribution to [NIPSCO's] fixed costs, and should not be adversely affected by the Settlement [Agreement] and [Contract for Power]. The Settlement [Agreement] and [Contract for Power] should not alter any other existing rates or contracts, nor should they adversely impact [NIPSCO's] genera-

tion, transmission, or distribution capabilities and facilities.

> There is substantial evidence of record to support the conclusion that the Settlement [Agreement] and [Contract for Power] are in the public interest and comply with applicable statutory provisions. Based on the foregoing, the Commission finds that the Settlement [Agreement] and [Contract for Power] are reasonable and just and in the public interest, and should be approved in their entirety and without change.

Appendix at 54.

For several years, the parties did business within the context of the documents executed in mid–1999. On October 1, 2005, the price adjustment factor took effect. It became apparent, however, that the parties disagreed about its application. Specifically, they disagreed whether the market based price adjustment factor applied to the Demand Charge. Indeed, since the time the price adjustment factor took effect, U.S. Steel has paid only the undisputed charge, including application of the price adjustment factor to the Energy Charge.

On November 17, 2006, U.S. Steel filed a Complaint with the IURC. Two months later, it moved for summary judgment. NIPSCO responded by asking the IURC to "deny summary judgment for [U.S. Steel], and instead, grant summary judgment for NIPSCO." Appendix at 100. The IURC held a hearing to consider the parties' arguments, but it did not take any evidence. On May 9, 2007, the IURC granted U.S. Steel's Motion for Summary Judgment.

NIPSCO now appeals, asking this Court to reverse and remand with instructions to grant summary judgment in favor of NIPSCO.

## Discussion and Decision

### I. Standard of Review—Agency Interpretation of Regulatory Settlement Agreement as a Matter of Law

■ The parties advocate different standards for our review of the IURC's decision. In light of the absence of any genuine issues of material fact, the IURC's granting of summary judgment, and the IURC's reliance on principles of contract interpretation to resolve the dispute, NIPSCO seeks de novo review. In contrast, U.S. Steel asks that we give deference to the IURC, as the agreement required regulatory approval and set the price of electricity, "an issue at the core of the Commission's regulatory expertise." Appellee's Brief at 9.

■ "Generally, construction of the terms of a written contract is a question of law and reviewed de novo." *Berkel & Co. Contractors, Inc. v. Palm & Assoc.*, 814 N.E.2d 649, 657 (Ind.Ct.App.2004). Also, we review de novo the grant or denial of summary judgment. *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 531 (Ind. 2006).

Indiana Code Chapter 8–1–2 (Utility Regulation) requires IURC approval of an agreement between a utility and its customer.

Ind.Code § 8–1–2–24 (Surplus profits; division or distribution; sliding scale of charges).

Nothing in this chapter shall be taken to prohibit a public utility from entering into any reasonable arrangement with its customers or consumers, or with its employees, or with any municipality in which any of its property is located, for the division or distribution of its surplus profits, or providing for a sliding scale of charges or other financial device that may be practicable and advantageous to the parties interested. No such arrangement or device shall be lawful until it shall be found by the commission, after investigation, to be reasonable and just and not inconsistent with the purpose of this chapter. Such arrangement shall be under the supervision and regulation of the commission.

Ind.Code § 8–1–2–25 (Rates and charges; rules and regulations involving changes).

The commission shall ascertain, determine and order such rates, charges and regulations as may be necessary to give effect to such arrangement, but the right and power to make such other and further changes in rates, charges and regulations as the commission may ascertain and determine to be necessary and reasonable, and the right to revoke its approval and amend or rescind all orders relative thereto, is reserved and vested in the commission, notwithstanding any such arrangement and mutual agreement.

Ind.Code §§ 8–1–2–24 and –25.

Where the IURC makes findings, our Supreme Court has addressed the standard for appellate review of the Commission's interpretation of a regulatory settlement agreement. In *U.S. Gypsum, Inc. v. Indiana Gas Co.*, the IURC considered settlement agreements pursuant to the above statutes. The OUCC and some citizen groups alleged that the agreements breached earlier settlements. The IURC conducted a five-day hearing and issued "lengthy findings," including that the agreements were in the public interest and an estimate that they would allow Indiana Gas to reduce its costs by $16 million. *U.S. Gypsum, Inc. v. Ind. Gas Co.*, 735 N.E.2d 790, 794, 803 (Ind.2000). Based upon its findings, the IURC concluded that the settlement agreements did not breach the earlier settlements and approved the proposed agreements. *Id.* at 803. Our

Supreme Court affirmed, reasoning as follows:

> The Opponents' arguments have some allure. It is apparent that what the settling parties anticipated from the settlement is different from what they will now receive. On the other hand, [the] settlements were not ordinary contracts. In proposing the settlements to the Commission, the parties cited Indiana Code Sections 8–1–2–24 and –25. [Explanation of the two sections.] In other words, a settlement approved by the Commission "loses its status as a strictly private contract and takes on a public interest gloss." *Citizens Action Coal. v. PSI Energy, Inc.*, 664 N.E.2d 401, 406 (Ind.Ct.App.1996).
>
> Here, the Commission found not only that the settlements were not breached, but *also* that the ProLiance agreements were in the public interest and that the reasonableness of the transportation credit can be explored in pending gas cost adjustment proceedings.... In light of the Commission's factual findings and the substantial deference owed to the Commission in supervising settlements and even modifying or revoking orders entered attendant thereto, we find no error.

*Id.* at 803–04 (emphasis in original).

While the *Gypsum* Court addressed an IURC order with extensive findings, this Court reviewed de novo an IURC order very similar to the instant Order on Summary Judgment in *Indiana Bell Telephone Co., Inc. v. Time Warner Communications of Indiana, L.P.* Ameritech and Time Warner entered an agreement soon after passage of the Telecommunications Act of 1996. As a dispute arose over payment, Time Warner filed a complaint with the IURC and later moved for summary judgment. The IURC granted Time Warner's motion for summary judgment. On appeal, Ameritech argued that the IURC erred in applying contract law to the agreement. As here, Ameritech and an intervenor proposed conflicting standards of review. The intervenor, however, offered no authority for its assertion that the Court should review whether the IURC's order was arbitrary or capricious. The *Indiana Bell* Court reviewed the IURC's order de novo, stating:

> because this case involved the interpretation of a written contract decided on summary judgment, and because AT & T cites no authority for applying its suggested arbitrary and capricious standard of review, we grant Ameritech the benefit of the doubt and review the IURC's decision de novo.

*Ind. Bell Tel. Co. v. Time Warner Commc'n of Ind.*, 786 N.E.2d 301, 305 (Ind.Ct.App.2003).

The *Indiana Bell* Court cited *Cowper v. Collier*, in which this Court reviewed de novo an order of the Natural Resources Commission. The *Cowper* Court stated that "the law is the province of the judiciary and the reviewing court is not bound by an agency's conclusions of law" and "the parties' contract dispute was not a matter requiring the weighing of extrinsic evidence but rather was contained by its four corners, the interpretation and construction of which is a function for the court." *Cowper v. Collier*, 720 N.E.2d 1250, 1255–56 (Ind.Ct.App.1999) (citations omitted), *trans. denied.*[5]

---

5. *But see* four cases cited by U.S. Steel for the proposition that "[a]n appellate court may properly defer to the Commission's expertise both in finding the facts and in applying the law to the facts." *N. Ind. Pub. Serv. Co. v. Ind. Office of Util. Consumer Counselor*, 826 N.E.2d 112, 116, 118 (Ind.Ct.App.2005). *See also Hancock County Rural Elec. Membership Corp. v. City of Greenfield*, 765 N.E.2d 618, 623–24 (Ind.Ct.App.2002) and *Wilfong v. Ind.*

Here, the IURC was explicit that it made its decision as a matter of law, employing only principles of contract interpretation. It noted that "summary judgment is not commonly employed before the Commission." App. at 12.

> Neither U.S. Steel nor NIPSCO ha[s] raised any disputed issues of material fact. Rather, this dispute arises over the interpretation of Article 5 of the Contract and whether the Contract is unambiguous and whether it is fully integrated, consisting of only the Contract itself, or whether the Term Sheet and Letter Agreement should be considered in interpreting the Contract, and if so, whether the agreement as a whole is unambiguous. Consequently, the parties' dispute does not involve any contested material facts but rather only questions of contract interpretation. Interpretation of the language in a contract is a question of law for which summary judgment is particularly appropriate. In addition, whether the Contract is integrated is also a question of law.

*Id.* at 13 (citations omitted). The IURC concluded that "the Contract is the fully integrated agreement of the parties for the purchase of electricity and ... neither the Term Sheet nor Letter Agreement was incorporated therein." *Id.* at 14.

Unlike *Gypsum*, in which the IURC weighed considerable evidence and used its expertise in utility issues, the IURC

took no evidence at all in the instant dispute. As in *Indiana Bell*, the IURC entered summary judgment based only upon its interpretation of the agreements executed in mid–1999. The IURC's analysis is limited to principles of contract interpretation. The lone reference to utility law is the fact that, in 1999, the parties did not provide the Letter Agreement or Term Sheet for the Commission's consideration of the agreement, submitting only the Contract for Power and the Settlement Agreement. Analysis of this fact and the parties' arguments concerning it, however, does not require expertise in utility regulation. To the contrary, it invokes issues of legal process, as discussed *infra*. While U.S. Steel asks that we give deference to the IURC, there is simply no application of expertise to which we can defer. Accordingly, we review de novo the IURC's Order on Summary Judgment.

## II. Interpretation of Price Adjustment Factor and Integration Clauses

■ Each party asserts that the terms of their agreement are unambiguous, but they disagree in all other respects regarding the IURC's interpretation of the relevant contract provisions. The parties dispute the meaning of Articles 5.1 and 5.2 of the Contract for Power; specifically, whether the market based price adjustment factor applied to the Demand Charge. NIPSCO argues in the alternative that, given the integration clauses in the Contract for Power and the other six

---

*Gas Co.*, 399 N.E.2d 788, 790, 792 (Ind.Ct. App.1980). In these cases, however, the IURC or its predecessor made findings of fact. Furthermore, our Supreme Court did not use this language in its *Gypsum* analysis.

This proposition originated when our Supreme Court, in a decision also cited by U.S. Steel, held that the Industrial Board had jurisdiction to find and conclude whether a party had fraudulently induced a claimant to miss his statute of limitation. *Gayheart v.*

*Newnam Foundry Co.*, 271 Ind. 422, 393 N.E.2d 163, 166 (1979). The *Gayheart* Court did so in light of the appellate courts being "ill-equipped to handle such a fact-finding process. Conversely, finding facts and applying the law to such facts is the gravamen of the work of the Industrial Board." *Id.* Given how this proposition was originally developed, it is a stretch to suggest that it supports giving deference to the IURC's contract interpretation where no facts are disputed.

documents, a review of all seven documents supports a conclusion that the parties intended the price adjustment factor to apply to the Demand Charge. U.S. Steel responds that the integration clause of the Contract for Power was unambiguous, reflected the parties' intent that the Contract for Power constituted the entirety of their agreement, and therefore precludes analysis of the other six documents executed in mid–1999.

### A. Principles of Contract Interpretation

■■■ "Indiana follows 'the four corners rule' that 'extrinsic evidence is not admissible to add to, vary or explain the terms of a written instrument if the terms of the instrument are susceptible of a clear and unambiguous construction.'" *Univ. of S. Ind.*, 843 N.E.2d at 532 (quoting *Hauck v. Second Nat'l Bank of Richmond*, 153 Ind. App. 245, 286 N.E.2d 852, 861 (1972)). Where a document is capable of clear and unambiguous construction, we must give effect to the document's clear meaning without resort to extrinsic evidence. *Univ. of S. Ind.*, 843 N.E.2d at 532. A document is not ambiguous merely because the parties disagree about its meaning. *Id.* Nor is a contract unambiguous merely because each party argues that it is. *See id.* at 532, 534. "[L]anguage is ambiguous only if reasonable people could come to different conclusions as to its meaning." Id. at 532. "[W]here an instrument is ambiguous, all relevant extrinsic evidence may properly be considered in resolving the ambiguity." *Id.* at 535. If, as here, there is no genuine issue of material fact, the issue is resolvable on summary judgment. *See id.*

■■■ The contract is to be read as a whole, attempting not to render any words, phrases, or terms ineffective or meaningless. *Mid–States Gen. & Mech. Contracting Corp. v. Town of Goodland,* 811 N.E.2d 425, 431 (Ind.Ct.App.2004). The Court must accept an interpretation that harmonizes a contract's provisions. *Id.*

### B. Interpretation of Price Adjustment Factor Provision

Article 5.1 of the Contract for Power contains the following provision:

> [NIPSCO] will bear the fuel price risk during the term of this contract; however, effective October 1, 2005 through the end of the Contract term; a market based price adjustment factor will be used to adjust *the kilowatt-hour prices set forth in Article 5.2.*

App. at 32 (emphasis added). Article 5.1 did not contain the terms "Demand Charge" or "Energy Charge." Article 5.2 provided for a Demand Charge, measured in *dollars-per-kilowatt,* and an Energy Charge, measured in *mills-per-kilowatt-hour.* Under the heading "Energy Charge," Article 5.2 provided that the "Demand Charge includes [R +. 1][6] hours use for each kilowatt of Billing Demand in the month." *Id.* at 33 (emphasis added).

Each charge referred to the same five time periods. The Demand Charge was marginally lower for each successive time period. In contrast, the Energy Charge was constant throughout the entire term of the Contract for Power, despite being set forth in five identical and successive sentences. Up to "[R + .1] hours use for each kilowatt of Billing Demand in the month," the Demand Charge controlled the price at which NIPSCO would sell electricity to U.S. Steel. *Id.* The Energy

---

**6.** In the Contract for Power, the parties rounded the number up to the nearest whole number.

Charge set a constant price "for energy used in the month in excess of [R + .1] hours of Billing Demand in the month." *Id.*

The dispute arises from the fact that, while each charge determines the price of electricity, the Demand Charge and Energy Charge are stated in different measures—dollars-per-*kilowatt* and mills-per-*kilowatt-hour*. Meanwhile, the price adjustment factor, as provided in Article 5. 1, applied to "the kilowatt-hour prices set forth in Article 5.2." App. at 32. Each charge appears in Article 5.2, but only the Energy Charge is designated with a term referencing a "kilowatt-hour."

Thus, we begin by analyzing whether Articles 5.1 and 5.2 are ambiguous. As U.S. Steel emphasizes, Article 5.1 stated plainly that the price adjustment factor applied to the kilowatt-hour prices in Article 5.2. Only the Energy Charge was designated in kilowatt-hours; the Demand Charge was not. NIPSCO responds with its own plain-language argument—Article 5.2 provided that the "Demand Charge includes [R + .1] hours use for each kilowatt of Billing Demand in the month." *Id.* at 33. During oral argument, the parties agreed that a "kilowatt-hour" is energy. "Kilowatt" was described as power by NIPSCO and demand by U.S. Steel. The U.S. Energy Information Administration defines "watt" as "a unit of electrical power" and "watthour" as "[t]he electrical energy unit of measure equal to one watt of power supplied to, or taken from, an electric circuit steadily for one hour." http://www.eia.doe.gov/glossary/glossary—w.htm (last viewed Feb. 7, 2008). For example, the amount of electricity required to light a lightbulb is measured in watts. Turning that lightbulb on for a given time is measured in watt-hours. Thus, a watt measurement denotes the power that it would take to perform a task. A watt-hour measures the amount of electricity actually consumed during the period of time the task is performed.

NIPSCO adds that it would make no sense to use the plural word "prices" in Article 5.1 to refer only to the Energy Charge because it was constant throughout the term of the Contract and because the price adjustment factor only applied to the final time period. Thus, the Energy Charge for that time period would have only one price. Therefore, NIPSCO argues, use of the word "prices" implies the parties' intention for the price adjustment factor to apply to the price of the Demand Charge, as well as the price of the Energy Charge. U.S. Steel counters with two arguments, neither of which we find compelling. First, U.S. Steel argues that Article 5.2 contained multiple prices for the Energy Charge because the same price was specified in five successive and identical sentences. This reasoning places form over substance. There was one price for the Energy Charge. Second, U.S. Steel directs the Court to the following provision in the Definitions section of the Contract for Power: "[u]nless the context plainly indicates otherwise, words importing the singular number shall be deemed to include the plural number (and vice versa)." App. at 29. However, this language merely begs the question whether "the context plainly indicates otherwise." *Id.* We conclude that the provision cited by U.S. Steel might be helpful for non-material terms, but the sale price is not one of them.

During oral argument, NIPSCO directed us to a bill, showing the Demand Charge as significantly larger than the Energy Charge. Because each party had reason to account for the risk of fluctuating electricity prices six to ten years in the future, especially within the context of utility deregulation, NIPSCO argues that it would have made no sense for the parties

to account for price fluctuation for the smaller Energy Charge, but not for the larger Demand Charge. U.S. Steel responds by citing the initial phrase of the price adjustment factor sentence:

> *[NIPSCO] will bear the fuel price risk during the term of this contract;* however, effective October 1, 2005 through the end of the Contract term; a market based price adjustment factor will be used to adjust the kilowatt-hour prices set forth in Article 5.2.

App. at 32 (emphasis added). U.S. Steel argues that applying the price adjustment factor to both charges would render this phrase meaningless. We disagree. In the above quote, the parties referred to two different risks—fluctuation over time in fuel prices and in electricity prices. That intent is clear from the parties' words. The first phrase stated plainly that NIPSCO would "bear the fuel price risk during the term of this contract." *Id.* In contrast, all of the language after the word "however" referred to fluctuation in "kilowatt-hour prices," a measure not of fuel, but of electricity. Furthermore, the price adjustment factor was "tied to a mutually agreed market based index such as CINergy Hub." *Id.* Ultimately, the parties did agree to use Cinergy Hub, which indexes electricity prices.[7] Contrary to U.S. Steel's assertion, NIPSCO's interpretation of Article 5.1 does not vitiate the provision that NIPSCO bore the fuel price risk for the entire term.

As a matter of drafting, if the parties had intended to limit the price adjustment factor to the Energy Charge, there was a simpler way to do it, for example: "The market based price adjustment factor applies to the Energy Charge." Instead, they used the more general term "kilowatt-hour," meaning power actually supplied. If the parties intended something more precise than NIPSCO's interpretation, they would have used a more precise term.

The only functional distinction between the Demand Charge and the Energy Charge was the amount of electricity demanded per month by U.S. Steel. At or below $(R + .1)$ hours use for each kilowatt of demand, the Demand Charge applied; beyond that, the Energy Charge applied. The product, electricity actually supplied, was the same for each charge. For the foregoing reasons, we conclude that Articles 5.1 and 5.2 of the Contract for Power were unambiguous and were meant to apply the market based price adjustment factor to the Energy Charge and the Demand Charge.

### C. Interpretation of Integration and Related Clauses

In light of NIPSCO's alternative argument, we also analyze the agreement assuming that Articles 5.1 and 5.2 of the Contract for Power were ambiguous. NIPSCO argues that the Term Sheet supports its interpretation of Articles 5.1 and 5.2. As support, NIPSCO asserts that the integration clauses of the seven documents allow us to analyze the Contract for Power's pricing provisions within the context

---

**7.** The New York Mercantile Exchange describes Cinergy Hub as follows:

> The Cinergy Hub of the Midwest Independent Transmission System Operator, Inc., (MISO) offers buyers and sellers a trading point for electricity based on locational marginal pricing and a common price index that provides a standard price reference point.

> . . . .

> A competitive electricity market has evolved in recent years, resulting in business opportunities, price volatility, and market risk.

http://www.nymex.com/EM—desc.aspx (last viewed Feb. 8, 2008).

of the Term Sheet. "Writings executed at the same time and relating to the same transaction or subject matter will be construed together in determining the intent underlying the contracts." *HK New Plan Marwood Sunshine Cheyenne, LLC v. Onofrey Food Serv., Inc.*, 846 N.E.2d 318, 323 (Ind.Ct.App.2006), *reh'g denied.* However, U.S. Steel argues that the Contract for Power's integration clause was unambiguous and reflected the intention that the Contract for Power constituted the complete expression of the parties' agreement.

For purposes of our analysis, we note that the Contract for Power, the Settlement Agreement, the Letter Agreement, the Operation Agreement, the Lease, and the License were all executed within a forty-eight hour period, June 16 and 17, 1999. Meanwhile, the Letter Agreement was explicit in incorporating by reference the Term Sheet. Therefore, the parties' understanding was evidenced either by one document (U.S. Steel's argument) or seven documents (NIPSCO's argument).

*Relevant Provisions in the Contract for Power*

The Contract for Power defined "Agreement" and "Contract" as "this Contract for Electric Industrial Power Service.... Said Contract is set forth in its entirety herein." App. at 29. The Definitions section also provided that "terms such as 'hereof,' 'herein,' 'hereunder' and other similar compounds of the word 'here' shall mean and refer to the entire Agreement rather than any particular part of the same." *Id.* No mention was made, however, of terms such as "therein." Article 7.12 referred to the Operation Agreement, Lease, and License as follows:

[The parties] agree to develop and execute all required documentation which will transfer operation and control of the South Works generation facility, trans-mission line and transmission line right-of-way from [U.S. Steel] to [NIPSCO]. [NIPSCO] shall have operation and control of the South Works generator, transmission line and transmission line right-of-way during the term of this Agreement.

*Id.* at 39–40. Finally, the Contract for Power contained the following integration clause in Article 9.5:

*All terms* and Stipulations made or agreed to by the Parties in relation to the subject matter *of this Agreement and such other contemporaneous agreements* of the Parties *are completely expressed and merged in this Agreement, and such other contemporaneous agreements* and no previous promises, representations or agreements made by [NIPSCO's] or [U.S. Steel's] officers or agents shall be binding on either party unless *therein* contained. The terms of this Agreement cannot be added to, varied or waived, either verbally or in writing, by any agent, solicitor or any other person connected with [the parties], excepting executive officers of the [parties]; provided, however, any changes in the terms and conditions by the officers of the [parties] shall be in writing in the form of an amendment or supplement to this Agreement.

App. at 41–42 (emphases added). Thus, the Contract for Power acknowledged that other relevant documents were being executed contemporaneously and noted that at least some of them would address South Works.

Examining the critical first sentence of Article 9.5, the subject of the sentence was the terms of all seven documents, given our analysis *supra* of what documents were executed contemporaneously. The verb is "are completely expressed and merged." There is some question, however, into what the terms merge. U.S. Steel

suggests that the terms merged only into the Contract for Power and that the comma, in effect, ended that thought. But such an interpretation would render the words "and such other contemporaneous agreements" meaningless. Such an interpretation would not harmonize the contract's provisions. *See Mid–States Gen.*, 811 N.E.2d at 431.

In contrast, NIPSCO argues that the terms of all seven agreements merged into "this Agreement, and such other contemporaneous agreements." *App.* at 41. Following this interpretation, the second thought of the sentence would be that no previous promises were binding unless contained in a document. Furthermore, the drafters used the expression "therein contained," not "herein contained." As noted *supra*, derivatives of the word "herein" were defined to refer to the entire Contract for Power and nothing else. The Contract for Power did not address use of the word "therein." Presumably, then, use of the word "therein" in the integration clause was intended to mean the contemporaneous documents, while the phrase "this Agreement" was used to refer to the Contract for Power. For these reasons, we conclude that the Contract for Power's integration clause in Article 9.5 was unambiguous and supported NIPSCO's interpretation that the agreement consisted of all seven documents.

*Even if Integration Clause was Ambiguous*

Even assuming, arguendo, that the integration clause in the Contract for Power was ambiguous, we now analyze the various integration clauses of the other six documents to understand what documents the parties intended to reflect their agreement. The initial document, the Term Sheet, specified that NIPSCO would immediately draft a contract with terms "similar to the contract for electrical industrial firm incremental power service, which are on file with the IURC, *except as modified herein or in the definitive agreements.*" *Id.* at 118 (emphasis added). The final paragraph of the Term Sheet concluded, "U.S. Steel and NIPSCO will use their best efforts to develop mutually satisfactory contractual documents to *implement the provisions of this term sheet* and to obtain necessary corporate and IURC approvals thereof." App. at 123 (emphasis added). While the Term Sheet distinguished between itself and the "definitive agreements," the parties clearly intended any other documents to implement the Term Sheet's provisions.

One month later, the parties executed the Contract for Power, as well as the Letter Agreement, the Settlement Agreement, the Operation Agreement, the Lease, and the License. The Letter Agreement noted that:

the Parties executed a *Term Sheet,* attached hereto as Exhibit A and *incorporated herein by reference,* which resolves all issues between U.S. Steel and Northern Indiana regarding South Works and service of electric energy to U.S. Steel's Gary Works steel production facilities ("Gary Works"). The *purpose of this Letter Agreement and the agreements referred to in Paragraph 1 below is to implement the provisions listed in Exhibit A and resolve the litigation between the Parties.* Accordingly, [the parties] agree as follows:

1. The Parties, contemporaneous with this Letter Agreement, are entering into a *Settlement Agreement, a Contract for Electric Industrial Power Service, an Operation and Control Agreement, a Facility/Property Lease, and an Access/Use License Agreement (collectively the "Agreements").* The *Agreements collectively constitute the entire agreement of the Parties* with re-

spect to the subject matters addressed therein, and all terms, stipulations and understandings of the Parties in relation thereto are completely expressed and merged in the Agreements. No previous promises, representations or understandings by any of the Parties or by the officers or agents of any of the Parties shall be binding on any of the Parties except as contained in the Agreements.

2. The Agreements shall be construed together and in conjunction with each other in order to effectuate the full intent of the Parties. . . .

3. The Parties stipulate and agree that the Settlement Agreement and the Contract for Electric Industrial Power Service shall be subject to enforcement by the [IURC]. . . . [A]ny claim . . . arising out of or relating to the Settlement Agreement or the [Contract for Power] shall be brought before the Commission. . . .

4. The Parties stipulate and agree that *this Letter Agreement,* the [Operation Agreement], the [lease], and the [License] *shall be subject to enforcement* before a court of competent jurisdiction located in Indianapolis. . . .

*Upon full execution, this Letter Agreement shall be binding and effective with respect to all the Parties.*

App. at 114–16 (emphases added).

The Letter Agreement indicated that all six documents executed in June, including itself, were intended to implement the Term Sheet. The other five June documents, contemporaneous with the Letter Agreement, "collectively constitute[d] the entire agreement of the Parties." *Id.* at 114. Meanwhile, the parties provided explicitly for the manner of enforcement for all six documents executed in June. Accordingly, our interpretation of the Letter Agreement suggests that all seven docu-

ments were intended to constitute collectively the agreement of the parties.

As U.S. Steel accurately notes, the Settlement Agreement referred only to itself, the Contract for Power, and the parties' agreement to enter contracts regarding South Works and the transmission line. Together, those five documents, to the exclusion of the Letter Agreement and the Term Sheet, "settle[d] and resolve[d] any and all issues, claims, contentions, rights, obligations and remedies which [the parties] have raised or could have raised in the Complaint Proceeding." *Id.* at 25. However, this language sought only to resolve litigation that had encompassed "nearly two decades." *Id.* at 23. *Nothing in the Settlement Agreement addressed what document or collection of documents constituted the entirety of the parties' agreement.* App. at 24–27.

As to the other three documents, the parties stated explicitly in the Operation Agreement that all seven documents executed in mid–1999 constituted the agreement.

[The Operation] Agreement, the [Contract for Power], the [Lease], the [License], the Letter Agreement and the Settlement Agreement ("Agreements"), including any terms and conditions incorporated or attached hereto, constitute, express, and represent collectively the Agreements between [the parties], and there are no representations, oral or written, that have not been incorporated in the Agreements.

*Id.* at 125. Although entered by SWPC for NIPSCO's benefit, rather than by NIPSCO itself, the Lease and the License each identified all six June documents (and therefore all seven documents) as setting forth the parties' collective agreement. *Id.* at 152–53, 161.

Finally, U.S. Steel offers the following very practical argument:

> To the extent NIPSCO contends [the Letter Agreement and the Term Sheet] affect the determination of the price of electricity, however, the failure to present them to the Commission would leave the regulator in a position of not knowing what rate it was approving.... A document cannot be at once both immaterial for purposes of regulatory approval and yet essential to deciding the approved rate.

Appellee's Br. at 19. While superficially appealing, this argument fails for at least four reasons. First, the IURC's 1999 approval of the Settlement Agreement and the Contract for Power is not being appealed. Second, the parties conducted themselves pursuant to the 1999 documents and the IURC order for more than five years without incident, at least none referenced in the record. Third, the parties would have had no reason to submit the Letter Agreement and the Term Sheet to the IURC because the parties believed that the Contract for Power was unambiguous.[8] Indeed, their arguments on appeal demonstrate that they still consider the Contract for Power to be unambiguous. From the parties' perspectives at the time, submission of the other documents would have been duplicative. Finally, in the Settlement Agreement itself, the parties stipulated to the adequacy of the Contract for Power and the Settlement Agreement for purposes of the IURC's consideration.

> [The parties] stipulate and agree that the evidence to be submitted in the Complaint Proceeding in support of this Settlement Agreement, including the attached [Contract for Power], constitutes substantial evidence sufficient to support

the Settlement Agreement and provides an adequate evidentiary basis upon which the Commission can make any findings and conclusions necessary for the approval of the Settlement Agreement and attached Exhibit A as filed.

App. at 25. Having so agreed, U.S. Steel is now foreclosed from claiming that the evidence before the IURC in 1999 was insufficient.

The relevant documents contain multiple acknowledgments that the parties considered all six documents executed in June, and therefore also the Term Sheet incorporated by reference to the Letter Agreement, to be enforceable, mutually dependent, and indicative, collectively, of the parties' intentions. In light of the documents' terms, especially given the fact that the parties executed six of them over the course of forty-eight hours, we conclude that all seven documents executed in mid–1999 reflected collectively the parties' agreement.

### D. Reading Articles 5.1 and 5.2 within the Context of the Term Sheet

Other than the Contract for Power, the only other document to include pricing terms was the Term Sheet. The Term Sheet designated the same five time periods as the parties would include one month later in the Contract for Power. For each of those time periods, the Term Sheet specified the price for power in a mill-per-kilowatt-hour measure, the measure used for the Contract for Power's Energy Charge, but not the Demand Charge. We refer to the Term Sheet prices as $S1$, $S2$, $S3$, $S4$, and $S5$, for the respective time periods. Consistent with the Demand Charge, the prices in the Term Sheet were

---

8. Any suggestion that either of the parties recognized the potential ambiguity in 1999 would assume a disingenuous gamesmanship dating back nine years. We are unwilling to make that assumption.

marginally lower for each successive time period.

The parties started from the understanding that the prices specified in the Term Sheet were subject to "Contract Determinants" and a market based price adjustment factor. App. at 121. The Contract Determinants were "[Q] KW of demand and energy usage of [P] Kwh." *Id.* "Effective 10/1/05, a market based price adjustment *factor* will be used to adjust the Kwh prices." *Id.* at 122 (emphasis in original). Thus, addressing the electricity price risk was a relevant term from the beginning. By using the phrase "the Kwh prices," the parties acknowledged that they understood the prices in the Term Sheet to be kilowatt-hour prices. Id. (emphasis added). As with the Demand Charge, the Term Sheet only applied the price adjustment factor to the last of the five time periods.

NIPSCO argues that the Term Sheet's pricing provisions reflected the parties' intention that the price adjust factor apply to the Demand Charge. In so arguing, NIPSCO notes that the Term Sheet applied the price adjustment factor to its charge. Next, NIPSCO calls attention to the fact that the parties referred to the Term Sheet's charge as a kilowatt-hour price. Finally, the core of NIPSCO's argument on this issue is based upon the following equations, using the Contract Determinants and the mill-per-kilowatt-hour prices in the Term Sheet:

$$P \text{ kilowatt-hours} / Q \text{ kilowatts} = R$$

P and Q were Contract Determinants from the Term Sheet. R is simply a relationship of P and Q. R was rounded up to the nearest whole number in the following sentence of the Contract for Power: "The Demand Charge includes [R + .1] hours use for each kilowatt of Billing Demand in the month." App. at 33.

*Next,* multiplying R by the mill-per-kilowatt-hour prices in the Term Sheet:

$$R \times S1 = T1; \quad R \times S2 = T2; \quad R \times S3 = T3; \quad R \times S4 = T4; \text{ and finally, } R \times S5 = T5$$

T1 through T5 equal, *to the penny,* the respective dollar-per-kilowatt prices in the Contract for Power. Thus, all of the prices in the Demand Charge, including the price for the relevant time period, replicated, though in a different measure, the prices and Contract Determinants in the Term Sheet.

U.S. Steel characterizes NIPSCO's argument as "involv[ing] elaborate explanation and mathematical manipulation." Appellee's Br. at 10. "NIPSCO's contorted efforts to translate the prices shown in the Term Sheet through mathematical manipulation into figures appearing in the final [Contract for Power] says (sic) nothing about the intent of the parties with respect to the application of the adjustment factor to the Demand Charge." *Id.* at 31. U.S. Steel does not, however, dispute the accuracy of the equations, which show the prices in the Term Sheet to be identical to those in the Contract for Power and show terms regarding demand and use to be fractionally different (R compared to R + .1).

Perhaps as a function of the above analysis, the parties dispute the very manner of the Demand Charge. On eight different pages in its Appellee's Brief, U.S. Steel asserts that the prices in the Term Sheet reflected actual usage, while the prices in "the *Demand Charge must be paid in full regardless* of whether U.S. Steel uses all, part or none of the electricity within its billing demand." *Id.* at 8 (emphasis added). Accordingly, U.S. Steel argues that the Term Sheet established the precursor to the Energy Charge, not the Demand Charge. NIPSCO responds by noting that the Term Sheet and the Contract for Pow-

er both contained language providing that there were no minimums. "In other words, if U.S. Steel demands or 'takes' no electricity, it pays nothing." Appellant's Reply Br. at 6. The first sentence of Article 5 (Rates) in the Contract for Power stated that, "[t]his Contract is a requirements contract for firm service with no minimums or take-or-pay conditions." App. at 32. The Term Sheet's first of fourteen "Key elements" was "[a] requirements contract with no minimum or take or pay." *Id.* at 119. Given the similarity in these provisions, we are not convinced that the charge in the Term Sheet functioned in a manner differently from the Demand Charge.

Finally, U.S. Steel seeks to distinguish the Term Sheet and the Contract for Power on the basis that the Contract for Power added certain terms not contained in the Term Sheet. However, the documents made clear that the Term Sheet, executed in May, established the skeletal structure and "key elements" of the parties' agreement, to be implemented by subsequent and more formal documents. That the Contract for Power would include supplemental terms is to be expected. Therefore, even if the Contract for Power's pricing provisions *and* integration clause were ambiguous, it is clear that the parties intended the market based price adjustment factor to apply to the Demand Charge.

Articles 5.1 and 5.2 of the Contract for Power were unambiguous and required application of the market based price adjustment factor to the Demand Charge. Even if those provisions were ambiguous, however, duplication of the prices in the Term Sheet and the Demand Charge, combined with the Term Sheet's application of the market based price adjustment factor to its prices measured in kilowatt-hours, convince us that the parties intended to apply the market based price adjustment factor

to both the Demand Charge and the Energy Charge.

### Conclusion

We review de novo an agency's grant of summary judgment when it is based entirely upon principles of contract interpretation. Our analysis of the parties' arguments leads consistently to the same conclusion. Regardless of whether the Contract for Power's pricing provisions were ambiguous and regardless of whether its integration clause was ambiguous, summary judgment should be entered for NIPSCO.

We reverse and remand for the IURC to enter summary judgment for NIPSCO and to calculate the amount U.S. Steel owes NIPSCO for application of the market based price adjustment factor to the Demand Charge, effective October 1, 2005.

Reversed and remanded.

NAJAM, J., and CRONE, J., concur.