DEPARTMENT OF WATERWORKS FOR the CONSOLIDATED CITY OF INDIANAPOLIS, Indiana, Appellant–Respondent,

v.

COMMUNITY SCHOOL CORPORATION OF SOUTHERN HANCOCK COUNTY, Appellee–Complainant.

No. 93A02–1002–EX–218.

Court of Appeals of Indiana.

Sept. 8, 2010.

David T. McGimpsey, Phillip J. Fowler, Casey M. Holsapple, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellant.

Bryan H. Babb, Stephen C. Unger, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Southern Hancock School Systems (School) is scheduled to open a new intermediate school in August 2011. Pursuant to its plan, the School wants to connect a 2300–foot service pipe from an existing water main to its new facility. The Indianapolis Department of Waterworks (Water Company) denied the School's request to install a service pipe in lieu of a water main extension because the School's idea was contrary to the Water Company's rules and "good engineering practice." Appellant's Br. p. 5. This case comes before us following the Indiana Utility Regulatory Commission's (IURC) determination that the rules do not preclude the School from connecting a service pipe to its new facility from an existing main.

Appellant-respondent Water Company appeals the IURC's decision in favor of appellee-complainant School, claiming that the IURC's decision allowing the School to construct its own water service line rather than paying for a water main extension is

contrary to law because the new building does not abut an existing main as required by the Water Company's departmental rules. The Water Company also asserts that the IURC's factual determinations regarding the economics of the School's decision to connect to the existing main are not supported by the evidence and that the School failed to refute the Water Company's engineering plans and water quality analysis. Concluding that the IURC properly determined that the Water Company's rules do not preclude the School from connecting its new building to an existing water main and finding no other error, we affirm.

## FACTS[1]

The School is a duly organized corporation in accordance with Indiana Code section 20–26–2–4. It provides public education in and around New Palestine to nearly 3,500 students and abides by State and local directives limiting the capital costs associated with new school construction. The attached diagram depicts the property that the School owns near the intersection of County Road 600 West (CR 600) and County Road 200 South (CR 200) in Hancock County.[2]

As the diagram also illustrates, two schools in the system presently receive water through a single service pipe that is connected to a water main that runs along CR 600. The School previously paid the Water Company to extend that main along CR 600 to provide it with water service.

As noted above, the School is constructing a new intermediate school on the campus that is scheduled to open in August 2011.[3] In December 2008, the School requested permission from the Water Company and the sewer provider to connect the new intermediate school to separate water and sewer lines along CR 600. The sewer provider, GEM Utilities, granted the School's request, but the Water Company denied it. The Water Company indicated that if the School desired service to the new school, it would have to pay for a second main extension along CR 200 that would run perpendicular to the existing main that extended along CR 600.[4]

To extend the main along CR 200, Waterworks requested a $372,485 deposit from the School. If a new main was constructed along CR 200, the School would need to add an 800–foot service pipe to reach the main. It was estimated that the addition would cost approximately $40,000, for a total cost of about $412,000. In contrast, the School could install a service pipe and connect to the existing water main on CR 600 for approximately $168,000.

On March 24, 2009, the School filed an informal complaint with the Consumer Affairs Division (CAD) of the IURC, challenging the application of the rules[5] re-

1. We heard oral argument in Indianapolis on August 11, 2010. We commend counsel for their able written and oral presentations.

2. The School owns a total of approximately 120 acres in this area.

3. During the course of this litigation, it became apparent that the new school was originally set to open in August 2010. Appellant's App. p. 58, 207. However, the construction completion date was changed at some point, and the new facility is not expected to open until August 2011. Id. at 265. On April 1, 2010, the IURC denied Waterworks's "Verified Motion to Stay Implementation of Final Order Pending Appeal." Id. at 278.

4. The Water Company's proposal is indicated in the diagram by the dotted lines that run along these two county roads.

5. The IURC approved the Water Company's rules on September 11, 2002. Appellant's App. p. 30.

garding its request to install the service pipe. More specifically, the School requested that it be permitted to build the 2,300–foot service connection from CR 600 rather than pay for a main extension to its new school building along CR 200.

In response, the Water Company's general counsel sent a letter to the CAD on April 13, 2009, asserting, among other things, that

> The main extension would provide better overall service to the School and to the System as a whole for reasons that include, but are not limited to, service reliability, water quality, fire protection, and good public policy. The main extension provides better system reliability because it adds redundancy to the system.
>
> . . .
>
> Another factor in favor of the main extension is the increased fire protection that it would provide not only to the School, but also to the existing residents along the main extension route as well.
>
> . . .
>
> Further, water mains located in rights-of-way or easements and adjacent to public streets and roadways allow for ease of identification of and access to leaks. Utility personnel such as meter readers and field service representatives pass by such assets frequently, and are trained to identify and report these problems.

Appellant's App. p. 34–36. The Water Company also asserted that its proposal was not discriminatory and it was not denying water service to the school. It also added that the proposed main extension is "consistent with its Rules, good engineering practice, and public policy. . . ." *Id.* at 32–33. While the Water Company also claimed in its letter that it was lowering its cost estimate for the new main to $289,000, that price did not include the $40,000 cost

of the service pipe that the School would still have to pay.

On July 6, 2009, the CAD issued an informal disposition in the matter, concluding that the Water Company "provided sufficient reasoning in this case to request the installation of a water main in lieu of [the School's desire for] a service connection." *Id.* at 54–55. The School then appealed that decision to the IURC on July 23, 2009. Following a hearing, the IURC reversed the CAD's decision and issued an order on January 27, 2010, in favor of the School, holding in relevant part that

> [T]his case is seemingly nothing more than a straightforward request for the connection of a service pipe to an existing main by the School Corporation. This request was rejected by [the Water Department] in a manner not contemplated by its rules, the [IURC's] Administrative rules, or any other evidence in the Record.

*Id.* at 7. As a result, the IURC ordered that "[the School] shall be permitted to connect its new school to the existing main on CR 600 without delay." *Id.* at 9. The Water Company now appeals.

### DISCUSSION AND DECISION

#### I. Standard of Review

■ At the outset, we note that the parties dispute the standard of review that should be applied in this instance. The School points out that our Supreme Court observed in *NIPSCO v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1018 (Ind.2009), that "questions falling within the IURC's expertise are reviewed with a high level of deference even if they involve questions of law." In contrast, the Water Company contends that because there are no issues of disputed facts and an interpretation of the Water Company's rules is involved, a *de novo* standard of review must apply.

In other words, the Water Company asserts that we should afford no deference to the IURC's decision in this case.

In resolving this issue, we consider the circumstances in *U.S. Steel*, which discussed the standard of review that should be applied in instances where the IURC approved a settlement agreement between NIPSCO and U.S. Steel in an order. *U.S. Steel*, 907 N.E.2d at 1015. After a price adjustment provision set forth in the settlement agreement became effective, the parties later disagreed as to how the adjustment should be applied. As a result, U.S. Steel filed a complaint seeking to enforce its interpretation of the contract. U.S. Steel then filed a motion for summary judgment, which the IURC subsequently granted. NIPSCO appealed and we reversed. *NIPSCO v. U.S. Steel Corp.*, 881 N.E.2d 1065 (Ind.Ct.App.2008). Our Supreme Court granted transfer and initially discussed the proper standard of review that should be applied. More specifically, it was observed that the IURC was created by the General Assembly "primarily as a fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature." *U.S. Steel*, 907 N.E.2d at 1015. Moreover, the *U.S. Steel* Court commented that "the Commission's assignment is to insure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana." *Id.* Thus, it was determined that judicial review of an IURC order amounts to a multiple tiered review. On the first level, it requires a review of whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. *Citizens Action Coalition of Ind., Inc. v. N. Ind. Pub. Serv. Co.*, 485 N.E.2d 610, 612 (Ind.1985). Such determinations of basic fact are reviewed under a substantial evidence standard, meaning the order will stand unless no substantial evidence supports it. *McClain [v. Review Bd. Of Ind. Dept. of Workforce Dev.*, 693 N.E.2d 1314, 1317–18 (Ind.1998)]. In substantial evidence review, "the appellate court neither reweighs the evidence nor assesses the credibility of witnesses and considers only the evidence most favorable to the Board's findings." *Id.* The Commission's order is conclusive and binding unless (1) the evidence on which the Commission based its findings was devoid of probative value; (2) the quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a rational basis; (3) the result of the hearing before the Commission was substantially influenced by improper considerations; (4) there was not substantial evidence supporting the findings of the Commission; (5) the order of the Commission is fraudulent, unreasonable, or arbitrary. *Id.* at 1317 n. 2. This list of exceptions is not exclusive. *Id.*

At the second level, the order must contain specific findings on all the factual determinations material to its ultimate conclusions. *Citizens Action Coalition*, 485 N.E.2d at 612. *McClain* described the judicial task on this score as reviewing conclusions of ultimate facts for reasonableness, the deference of which is based on the amount of expertise exercised by the agency. *McClain*, 693 N.E.2d at 1317–18. Insofar as the order involves a subject within the Commission's special competence, courts should give it greater deference. *Id.* at 1318. If the subject is outside the Commission's expertise, courts give it less deference. *Id.* In either case courts may examine the logic of inferences drawn and any rule of law that may drive the result. *Id.* Additionally, an agency action is always subject to review as contrary to law, but this constitution-

ally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order. *Citizens Action Coalition*, 485 N.E.2d at 612–13.

*Id.* at 1016.

Notwithstanding this standard, NIPSCO advocated for de novo review because the case involved summary judgment and a question of law. *Id.* Moreover, NIPSCO maintained that the appeal involved a dispute between two private parties over interpreting a contract and because a court's role in interpreting a contract is to give effect to the parties' intent at the time the contract was made, the interpretation of the contract was a "question of law appropriate for de novo review." *Id.* at 1017. Finally, NIPSCO observed that because the IURC made no use of ratemaking principles or agency expertise, it deserved no deference on the question of contract interpretation.

In rejecting these arguments, the *U.S. Steel* Court determined that

> Regulatory settlements bear important differences from agreements governed purely by the law of contracts. Such an agreement does not become effective until and unless the Commission acts on the agreement. Ind.Code § 8–1–2–24 (2008). A contract between private parties takes on public interest ramifications once the Commission approves it. *U.S. Gypsum, Inc. v. Ind. Gas Co.*, 735 N.E.2d 790, 803 (Ind.2000) (quoting *Citizens Action Coalition of Ind., Inc. v. PSI Energy, Inc.*, 664 N.E.2d 401, 406 (Ind.Ct.App.1996)). The Commission maintains the authority and statutory responsibility to supervise and regulate the Contract.

*Id.* at 1017. Additionally, it was observed that

Here, the Commission approved the contract when the parties entered it, effectively making it an order of the Commission. This means the Commission interpreted its own order, not a contract entered by the parties and later disputed.

. . .

Agencies are not judicial bodies. They are executive branch institutions which the General Assembly has empowered with delegated duties. As such, an adjudication by an agency deserves a higher level of deference than a summary judgment order by a trial court falling squarely within the judicial branch. We therefore apply the established standard of review for judicial review of Commission orders. . . . Ultimate facts or "mixed questions" are evaluated for reasonableness, with the amount of deference depending on whether the issue falls within the Commission's expertise.

*Id.* Finally, the court in *U.S. Steel* noted:

> In this case, interpreting the Commission's order is a question falling well within the Commission's expertise. NIPSCO acknowledges the 1999 order itself involved the Commission's special competence, and interpreting the meaning of the order is not substantively different than approving the Contract. We therefore consider this question as a mixed question of law and fact with a high level of deference, examining the logic of the inferences made and the correctness of legal propositions without replacing our own judgment for that of the Commission.

*Id.* at 1018.

Similar to the issue that was presented in *U.S. Steel*, the question here involves the IURC's interpretation of its rules, the Water Company's rules, and the reasonableness of a water service connection.

The Water Company concedes that its rules "were approved by the [IURC] when it approved the transfer of the assets of Indianapolis Water Company to the Department [of Waterworks for the Consolidated City of Indianapolis] on September 11, 2002." Appellant's Br. p. 8. Like the IURC-approved contract that was at issue in *U.S. Steel,* the Water Company's rules have been authorized by the IURC. Thus, it follows that the IURC has special insight into the meaning of the rules it approved, so we consider this question "with a high level of deference." *Id.* at 1018.

## II. Waterworks's Claims

### A. The Rules

The Water Company contends that the decision must be set aside because the IURC misapplied two rules that are applicable in these circumstances. More particularly, the Water Company argues that because the facility does not "abut" an existing water main within the meaning of the rules, the School should not be permitted to construct its own service line "rather than paying the Department to build a main extension." Appellant's Br. p. 5.

We initially observe that the Water Company's Rule 7(J), which governs irregularly located service pipes, provides that

A service pipe which is irregularly located shall, at [the Water Company's] expense, be relocated and connected to a new main abutting the premises when subsequently installed for other purposes. [The Water Company] shall not be under any obligation to permit connection or to supply service to any customer whose premises does not abut a main.

Appellant's App. p. 120.

The rules also define "premise" as "the whole or part of a dwelling, building, or structure owned, leased, or operated by a single legal entity located on a single parcel or contiguous parcels of real estate...." *Id.* at 100. Moreover, the definition provides that each lot or service building will be considered a premises, and therefore, served by a separate service pipe. *Id.* Finally, a "service pipe" means "a supply line connecting a premises directly to [the Water Company's] main located (a) in a public right-of-way adjacent to the real estate upon which such premises is located...." *Id.*

Also relevant is Rule 7(D)(9), which applies to service pipe installation requirements:

The [Water Company], upon request, will review a customer's plans and specifications with respect to the type, location and arrangement for the service, service pipe and other facilities downstream from the meter, but the [Water Company] is not responsible for the adequacy of such service pipe and facilities downstream from the meter or for selection by the customer of the best or most economical type of service or metering arrangement.

*Id.* at 119.

In construing these rules, the IURC concluded that the creation of an additional premise was not at issue and the School could build a service line because its property abuts the main in CR 600 and "the service pipe will cross only the customer's property." Appellant's App. p. 8. Put another way, the IURC interpreted the rules such that the new School building itself was not required to abut the existing main.

In light of this determination, the Water Company asserts that the IURC's order directly conflicts with Rule 7(J). For instance, the attached diagram establishes that the new school building is approximately 800 feet south of CR 200. The building faces CR 200 and the means of

egress and ingress will be along that road. That said, the Water Company contends that the School's proposed service pipe is expected to extend nearly 1/2 mile from CR 600 across softball, football, and baseball fields before turning toward the new school building.

The Water Company claims that a main extension will serve future customers and offer enhanced fire protection service. Moreover, it asserts that Rule 7(J) requires mains to abut the *premises* and not merely the *property* of the customer, which will effectively "prevent customers and potential customers from constructing lengthy service pipes rather than extending mains as a way to preserve the operational integrity of the drinking water system." Appellant's Reply Br. p. 4. The Water Company asserts that it is afforded the ability to deny the request for a service pipe if the new building does not abut a main because it is responsible for the cost of placing an irregularly located service pipe. In other words, Waterworks is provided "some needed discretion in determining whether a customer is served through a service pipe or a main where the service pipe is to be irregularly located as is the case here." *Id.* at 5.

The Water Company further claims that the IURC's interpretation of Rule 7(D)(9) is contrary to law because that rule is not intended to allow potential customers to select a service line rather than a main extension. It contends that the IURC's decision and reliance on 7(D)(9) permits developers to request service lines of any length if they believe it would be cheaper than extending a water main.

■ In our view, the Water Company's proposition that each "new premise" must be served by a main extension directly contradicts the definition of "premises" that explicitly contemplates multiple premises—or buildings—on a "single parcel or contiguous parcels of real estate" being connected to the same main and each "served by a separate service pipe." Appellant's App. p. 100. Indeed, the School already has two facilities on its campus that are connected to the existing main on CR 600. When examining the definitions set forth in the rules and considering the circumstances here, it is apparent that the School's proposed connection plan fits squarely within the rules and definitions. More precisely, it was reasonable for the IURC to conclude that the School is a single legal entity connecting a service pipe to a main located adjacent to its real estate.

We acknowledge the Water Department's claim that Rule 7(J) is important because it supports the orderly development of its water system that will "benefit future customers along the main extension and offer enhanced fire protection." Appellant's Br. p. 10. However, the rules do not permit the Water Company to extend its service system by forcing the School to pay for a main that it did not request when the property is already served by an adequate water main that abuts its property. Of course, if the Water Company believes that construction of an additional main along CR 200 will provide an opportunity for future long term growth, it can independently pursue the main extension and cover any additional costs associated with such a project.

Although the Water Company argues that the customer must pay for the construction of a main if the main does not exist where a new building abuts a right-of-way, such an interpretation requires all buildings to be constructed on the extreme forefront of a customer's property so that the building will actually touch the property line. In essence, none of the rules allows the Water Company to deny a connection to an existing main abutting a cus-

tomer's property and force a main extension because it can get a new main closer to the premises.

The School already paid to extend the existing main (see diagram) to bring water to the School campus, and it was reasonable for the IURC to conclude that the School should not be prohibited from connecting a service pipe from the new school to the existing main that it paid to extend in order to bring water service to its property.

Even though a main extension would be closer to the new premises and might benefit the Water Company by extending its service territory, it is apparent that it would cost the School substantially more money, require crossing the property of other landowners, and still require the customer to install a service pipe for a connection. In short, the rules simply do not permit the Water Company to deny service so that it can determine the "best" method of servicing the region.

■ Finally, we note that Rules 7(A) and 7(B) place responsibility for the service line on the customer, thereby absolving the Water Company from responsibility to a customer who chooses to connect to an existing water main abutting his property with a lengthy service pipe. More specifically, Rule 7(A) provides that "[t]he service pipe shall be installed and owned by the customer," and Rule 7(B) states that "[t]he customer will maintain, repair or replace the portion of the service pipe, and appurtenances from the public right-of-way line to the premises." Appellant's App. p. 117. Thus, in accordance with these rules, the IURC correctly acknowledged that the Water Company is absolved "of all responsibility for the installation, maintenance, and ownership of the service pipe on the customer's property," once the School connects its service pipe to the main. *Id.* at 8.

In sum, the IURC's conclusion that the Water Company has an obligation under the rules to provide service from an existing main to the School whose property abuts that main is reasonable. We agree with the IURC's determination that to conclude otherwise in these circumstances and grant the Water Company the authority to control the service choice, force the School to pay for an unnecessary main extension, and still be released from responsibility for determining the best or most economical type of service, would be unreasonable under the rules. Thus, the Water Company has failed to show that the IURC's interpretation and application of the rules in these circumstances was unreasonable.

### B. IURC's Decision Not Supported with Substantial Evidence

■ Notwithstanding our conclusion that the IURC's interpretation of the rules was reasonable, the Water Company maintains that the judgment must be set aside because the School failed to present any evidence that the "service line is the best or most economical . . . option." Appellant's Br. p. 14. Moreover, the Water Company contends that the School did not present any rebuttal evidence regarding the various public benefits,[6] the water quality issues, and its ability to maintain

---

**6.** The Water Company suggests that subsequent connectors' fees from additional customers would allow the School the opportunity to potentially recoup the entire cost of the main extension because "landowners along the main extension route may decide to hook into the main extension in the future." Appellant's Br. 15. In other words, the Water Company asserts that the School would be entitled to subsequent connectors' fees from potential customers if it initially built the main extension and would be precluded from collecting various fees and allowances with a service line.

and repair the service lines that its general counsel submitted to the CAD in the letter dated April 13, 2009. Notwithstanding these claims, we note that the IURC did not make any factual findings regarding the best or most economical type of service connection to the School. Instead, the IURC observed that the School made its own determination as to what it believed to be the best option under the circumstances. While the IURC acknowledged the School's position in its ruling, it made no findings regarding the reasonableness or economics of that determination. Moreover, the Water Company did not submit any engineering or technical data to support the contentions of its general counsel.

Additionally, because we agree that this case is about the School's straightforward request to connect to the Water Company's existing main under the rules, the engineering evidence is inconsequential, inasmuch as the IURC had the discretion to evaluate, weigh, and reject the unsubstantiated evidence that was set forth in the Water Company's letter to the CAD.

Although the Water Company is seemingly asking us to place deference on the informal CAD process above the special expertise of the IURC, we note that an informal complaint submitted to the CAD is without prejudice to the right to file a formal petition. *See* 170 I.A.C. 1–1.1–5 (the IURC's review of the decisions of the CAD is de novo and the IURC's understanding of the facts underlying the complaint is taken from the record developed by the CAD, as well as the parties' subsequent filings).

In sum, we conclude that the Water Company's argument that the IURC's order must be set aside because there was not substantial evidence to support its judgment fails. And for all of the reasons explained above, we affirm the IURC's decision to permit the School to construct a service pipe and connect to the existing water main.

The judgment of the IURC is affirmed.

MATHIAS, J., concurs.

RILEY, J., dissents with opinion.

RILEY, Judge, dissenting with separate opinion.

I respectfully disagree with the majority's opinion in the resolution of this case. As acknowledged by the majority, "the question here involved the IURC's interpretation of its rule, the Water Company's rules, and the reasonableness of a water service connection;" the facts are not disputed. Op. p. 885. Thus, as we are faced with the interpretation of a rule, I take issue with the majority's application of a

"multiple tiered review" focused on the facts and with a "high level of deference" to the IURC's decision. *See* Op. pp. 884, 885–86. Instead, relying on the majority's precedent, I find the following passage to be more applicable to the question at hand:

[A]n agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling or order.

*U.S. Steel,* 907 N.E.2d at 1016 (quoting *Citizens Action Coalition of Indiana v. NIPSCO,* 485 N.E.2d 610, 612–13 (Ind. 1985)).

Turning to the disputed rule—the Water Company's Rule 7(J)—I would conclude that the IURC misinterpreted the rule and therefore exceeded its jurisdiction. As noted by the majority, Rule 7(J) provides that

A service pipe which is irregularly located shall, at [the Water Company's] expense, be relocated and connected to a new main abutting the premises when subsequently installed for other purposes. [The Water Company] shall not be under any obligation to permit connection or to supply service to any customer whose premises does not abut a main.

While this rule standing on its own might be considered ambiguous, the rule becomes very clear when read together with the specific definitions of its terms. In particular, "premise" is defined as "the whole or part of a dwelling, building, or structure owned, leased, or operated by a single legal entity located on a single parcel or contiguous parcels of real estate." (Appellant's p. 120). Additionally, "each lot or service building will be considered a premise, and therefore, served by a separate service pipe." (Appellant's App. p. 100).

Under the undisputed facts before us, the new intermediate school is constructed on its own parcel within the school corporation's campus. As far as I can discern, this new construction is not attached to any existing building but is an independent structure at the far end of the campus. Mindful of the rule and its accompanying definitions, the new school should be considered a "premise," pursuant to Rule 7(J), and thus it would be appropriate to require the School to pay for a new main extension.